## JORDAN v. NATRONA LUMBER COMPANY

(No. 2035; January 25, 1938; 75 Pac. (2d) 378)

394

For the plaintiff in error there was a brief by *H. B. Durham, C. M. Crowell* and *D. W. Ogilbee* of Casper, and oral arguments by *Messrs. Durham* and *Crowell.*

For the defendant in error, there was a brief by *Hagens & Wehrli* of Casper, and oral argument by *Mr. Wehrli.*

RINER, Justice.

This case brings before the court questions arising upon the record in a mechanic's lien foreclosure suit under the provisions of Chapter 66, W. R. S. 1931. The defendant in error, Natrona Lumber Company, hereinafter usually mentioned as the "Lumber Company" was plaintiff in that suit in the district court of Natrona County, and the plaintiff in error, Michael P. Jordan, for convenience subsequently referred to at times as the "owner" or "lessor," was a defendant, together with other persons who are not parties to this proceeding in error. The district court aforesaid entered a judgment foreclosing a mechanic's lien claim in plaintiff's favor upon certain real estate owned by Jordan, and he, alleging error, asks its reversal. The material facts are very little in dispute and appear to be these:

During part of the year 1920 and at all times since then, Jordan was, and now is, the owner of lots numbered 1 to 19 inclusive in Block numbered 6 in Burlington Addition to the City of Casper. There was located upon this property a brick building, which was of considerable size and which had been erected and used for a brewery in the pre-prohibition era. During the years 1920 until 1934 it had remained unoccupied except for the presence of a caretaker.

On January 27, 1934, the Wyoming Brewing and Distributing Company, a corporation organized under the laws of this state, as second party, which for brevity will be designated hereinafter as the "Brewing Company" or the "lessee," through its "Manager and Authorized Agent," one A. W. Thimmig, obtained from Jordan, as first party, a lease agreement covering the property above described, wherein it was agreed,

among other things, that the lessee should "hold said property and premises from date of this agreement until and including July 31st, 1934, upon and for the consideration in hand paid first party by second party, in advance, receipt whereof is hereby acknowledged by first party, of 120 shares of the capital stock of second party and upon the further consideration that second party shall, on or before February 28th, 1934, commence restoration of the Brewery Building upon said property and premises, to-wit: Installation of window panes where same now are missing, re-roofing of said Brewery Building and re-flooring of said Brewery Building, such restoration details to diligently continue until completed and in any case to be completed and accomplished during the aforesaid term of this lease." This contract, through its provisions, also gave the lessee an option to purchase the property aforesaid within the term of the lease by making certain payments commencing on or before July 1, 1934, with the privilege, under certain circumstances, of renewing the lease and exercising the option on or before the first day of February, 1935, the time for and the amounts of the several payments to be made on account thereof being duly fixed. It was specifically required, however, by the instrument that the lessee should have no right to have this option to purchase extended for the ensuing six months after the original term of the lease, or "to exercise said option in the event it shall default the aforesaid requirement of restoration of said building." The lessee also agreed thereby "that in case of any of the defaults above mentioned or in case of any other breach by it of this agreement that then and in such case it may be lawful for first party to declare the term hereof ended and recover the said premises or any part thereof with or without process of law."

The Brewing Company being without any funds for the purpose and haste being necessary, Thimmig pro-

posed to it that he do the restoration and reconditioning work on the building aforesaid, as required by the lease agreement above described. The lessee's board of directors accordingly at a meeting held January 31, 1934, authorized a contract to that effect between Thimmig and it, and this agreement was put in written form and duly executed by the president of the Brewing Company and Thimmig on the date last mentioned. The latter thereby agreed to receive as compensation for his services in the matter shares of the capital stock of the lessee in such amount as he should earn, the stock to issue as of the value of $5.00 per share. Neither the aforesaid lease nor the subsequent agreement of the Brewing Company with Thimmig was ever placed of record in the office of the County Clerk of Natrona County, Wyoming. Thimmig seems to have been the original promoter of the entire business arrangement and scheme.

He shortly thereafter went to Ladbury, who was the Secretary-Treasurer of the Lumber Company, informed him that the Brewing Company had bought the property in question, and arranged for the purchase of materials for the improvements to be made. The repairs on the building aforesaid were thereafter accomplished to the extent of putting on a new roof, setting a large amount of glass to replace broken windows, installing a number of doors and putting in place needed flooring. The Lumber Company supplied these building materials as they were ordered by Thimmig and charged them on open account to the Brewing Company. The first item of this bill for materials furnished by the Lumber Company was delivered by it on February 19, 1934, and the last item on May 1st of that year. All the items thus ordered were delivered to the Brewing Company on the property above described. Thimmig during all this time and until April 7, 1934, was the General Manager of the Brewing Com-

pany. The Lumber Company appears never to have learned of the agreement between the Brewing Company and Thimmig, referred to above, until after its claim of lien was filed. The Brewing Company failed to comply with the terms of the lease agreement between it and Jordan, and the latter cancelled it towards the end of the year 1934, or in February, 1935. Thereafter the Brewing Company seems to have gone out of business and defaulted its license fee to the state in the year 1936.

The Lumber Company's bill for materials remaining unpaid, it duly filed in the office of the County Clerk of Natrona County its claim of lien on August 23, 1934, against M. P. Jordan and the Brewing Company, in the sum of $926.44, with interest thereon from May 1, 1934, upon the premises hereinabove described. December 29, 1934, its suit to foreclose the lien was commenced by the Lumber Company against Jordan and his lessee, as well as some other defendants who claimed an interest in the property by virtue of asserted liens. The owner appeared and filed an answer in the form of a general denial. The lessee, however, made default, and such default was entered on the trial of the case, which resulted, as has been indicated, in a judgment of foreclosure of the Lumber Company's lien claim against Jordan's property, the amount found to be due at that time being $1,099.35, which amount it was also adjudged the Lumber Company was entitled to recover from the Brewing Company.

It is contended on behalf of Jordan that his reversionary interest in the property aforesaid cannot be charged with the lien claim by the Lumber Company on account of the materials it furnished the Brewing Company for improvements made by the latter upon his building, as it was required to do by the lease it held from him. The argument is presented that these repairs were solely for the benefit of the Brewing Com-

pany and not for Jordan; that the owner never agreed to pay the costs thereof, and that the lessee should not be regarded as the agent of the lessor in ordering the improvements thus placed upon the building.

In advancing these contentions the owner has made reference particularly to that part of Section 66-501, W. R. S. 1931, which reads:

"Every mechanic or other person, who shall do or perform any work or labor upon, or furnish any material, * * * for any building, erection or improvement upon land, or for repairing the same, under or by virtue of any contract with the owner or proprietor thereof, or his or her agent, trustee, contractor, or sub-contractor, upon complying with the provisions of this article, shall have for his work, or labor done, or materials, * * * furnished, a lien upon such building, erection or improvements, and upon the land belonging to such owner or proprietor on which the same are situated, * * *.",

and also to that part of Section 66-505, W. R. S. 1931, which declares that the entire land, to the extent indicated by the statute, upon which the "building, erection or other improvement is situated, * * * shall be subject to all liens created by this article, to the extent of all right, title and interest owned therein by the proprietor or owner of such building, erection or improvement for whose immediate use and benefit the labor was done, or things or material furnished." Special emphasis is placed by the owner upon Section 66-525, W. R. S. 1931, which is verbatim as follows:

"In all cases where a tenant is authorized by the landlord to put any improvements either within or on the outside of any building or upon the land upon which such building shall stand, the person doing any work or furnishing any material for the purpose of such improvement, shall have the same lien upon such house and land as is provided for in § 66-501; provided, it is agreed that the landlord is to pay the costs of such improvement."

While Section 66-525 seems not to have been borrowed from statutory phraseology in use in any other state, but to have been inserted for the first time in the law when it was passed in 1877 by our territorial legislature, the other two sections above mentioned are practically identical in terms with the statutes of Missouri dealing with the same matters. This court has heretofore indicated that our general mechanics' lien law was largely borrowed from the statutes of that state. Prugh v. Imhoff, 44 Wyo. 143, 9 Pac. (2d) 152; Becker v. Hopper, 23 Wyo. 209, 147 Pac. 1085; National Supply Co.—Midwest v. Weaver et al., 35 Wyo. 224, 248 Pac. 353. The decisions of the appellate courts of the commonwealth mentioned are therefore helpful and persuasive when pertinent.

In Ward v. Nolde et al., 259 Mo. 285, 168 S. W. 596, a mechanic's lien was sought to be established upon the land of the lessor, Delany, on account of certain changes and improvements in a building located on said land and leased by him to Nolde. The latter had made a contract with the plaintiff Ward, whereby the latter agreed to, and did, furnish labor and material for the improvements. The lease agreement between the parties aforesaid obligated Nolde to expend a specific sum of money in making these improvements. The court below enforced the lien claim, and it was urged by the owner of the property, as in the case at bar in behalf of Jordan, that the trial court had erred in holding that Nolde was agent of Delany within the meaning of Section 8212, Revised Statutes of Missouri, 1909, and that the work was done for the immediate use, enjoyment or benefit of Delany, so as to make his reversionary interest in the premises liable to a lien.

After quoting the pertinent portions of Sections 8212 and 8214 of the Revised Statutes of Missouri, 1909, which are practically identical with those parts of our Sections 66-501 and 66-505, W. R. S. 1931, set out

above, as well as the initial portion of Section 8234 of the Missouri statutes aforesaid, which also reads substantially the same as our Section 66-523, thus,

"Every person, including all cestuis que trust, for whose immediate use, enjoyment or benefit any building, erection or improvement shall be made, shall be included by the words 'owner or proprietor' thereof under this article," etc.,

the court in the course of its discussion of the question presented points out that:

"It is true that a tenant, as such is not the agent of the owner so as to establish a lien against the land of the owner for improvements made by the tenant. McGuinn v. Federated Mines & Milling Co., 160 Mo. App. 28, loc. cit. 32, 141 S. W. 467. Yet, on the other hand, this does not mean that a person, by reason of being the tenant, cannot be given the authority of agent to the extent of being able to bind the landlord's property with a lien under any circumstances. The agency does not spring from the relationship of landlord and tenant, but it may spring from another source, to wit, any act or contract upon the part of the landlord which amounts to the establishment of the power of agent in the tenant. The statute here under discussion has many times, been before the Courts of Appeal of this state for interpretation and construction, and it has been uniformly held that whenever the landlord binds or obligates the tenant to build or construct permanent and substantial improvements beneficial to the reversionary interest of the landlord, the person furnishing any part of the material or work for said specified improvements under or by virtue of a contract with said tenant has the right to a mechanic's lien against the reversionary interest of the landlord in the land improved—this, on the theory that the tenant, under such circumstances, becomes an agent of the owner within the contemplation of the mechanic's lien statutes. Lumber Co. v. Nelson et al., 71 Mo. App. 110; Dougherty-Moss Lumber Co. v. Churchill, 114 Mo. App. 578, 90 S. W. 405; Curtin-Clark Hardware Co. v. Churchill, 126 Mo. App. 462, 104 S. W. 476; McGuinn v. Federated Mines & Milling Co., 160 Mo. App. 28, 141 S. W.

467; Marty v. Hippodrome Amusement Co. et al., 173 Mo. App. 707, 160 S. W. 26."

Quoting at length from the case of Curtin-Clark Hardware Co. v. Churchill, cited by it as above, a decision by the Kansas City Court of Appeals also involving a mechanic's lien, the language of that court is given to this effect:

" 'But where, as in this case, no option is given the lessee, but he is compelled by his contract with the lessor to make certain alterations or forfeit his leasehold, the work should be regarded as being done under a contract with the lessor, and the relationship thus established between the parties with respect to the improvement is analogous to that of owner and contractor, and no reason can be perceived for saying that the unpaid accounts for material and work furnished under contract with the lessee should be denied the security of a lien against the estate of the lessor under the provisions of the Mechanic's Lien Law.' "

See also Allen Estate Ass'n. v. Fred Boeke & Son et al., 300 Mo. 575, 254 S. W. 858, and the comparatively recent case of American Sash & Door Co. v. Stein, (Mo. App.) 96 S. W. (2d) 927, which demonstrates the long continued adherence of the courts of Missouri to the rule announced above.

This rule, affecting contracts like that at bar, followed for so many years by the courts of Missouri, coincides as well with the great weight of authority under statutes in other jurisdictions with language resembling ours. We find the author of the note in 79 A. L. R. 962, 964, stating:

"Where the lease contains a provision requiring the lessee to make improvements, it is generally held that the lessee is thus constituted the agent of the lessor for that purpose, within the contemplation of mechanics' lien laws, and this is generally so irrespective of whether the cost of the improvements is to be borne by

the lessor or by the lessee, if it clearly appears that the lessee is obligated to make the improvements."

The statement is supported by an elaborate list of cases drawn from a great many jurisdictions. If a view should be announced contrary to the doctrine of these authorities, it would, it seems to us, enable an owner deliberately to select a lessee with indifferent financial responsibility, place him in possession of the demised premises under an obligation in the lease to put material and substantial improvements thereon, and when all were completed, to assert that he, the owner, could rightfully retain the improvements and the lessee only should be held accountable therefor, the consequence being that the owner would be able to secure labor, material and improvements to his building without a penny's expense to him, while those who supplied them would have parted with their work and property for little or nothing in return. As quite forcibly said by the Supreme Court of Iowa in Denniston & Partridge Co. v. Brown, 183 Iowa 398, 167 N. W. 190,

"It would open the door to great fraud in practice to allow the owner of property to lease it to another, contract with the other to put on permanent improvements, improvements that are only valuable when standing upon the property, and then say that the materialmen and the laborers who place these permanent improvements upon defendant's property have no claim against the property, and must go unrewarded if the tenant is insolvent. It would be an invitation to short leases with agreements in the lease that the tenant should build permanent structures upon the premises during the term of the lease, and this without jeopardizing any interest which the owner had in the property, while greatly profiting from the transaction. The owners had a right to put these structures upon the land. They contracted with the sanitorium to make these improvements upon the land. The improvements were made under the authority granted and in pursuance of the authority given. It would be inequitable to

hold that the materialmen and the laborers should, under a state of facts as shown here, be deprived of the benefit of a statute made for their protection."

But it is insisted that Section 66-525, supra, which does not appear in the laws of Missouri, is determinative of this case, it being said that, "the only agreement between Jordan and the Brewing Company is contained in the lease itself, and in no paragraph, sentence, or phrase therein is there a statement, or even so much as an intimation, that Jordan was to pay the costs of the repairs and improvements." But we are quite unable to see that this contention is correct. This section of the law has to do with a lease "authorizing" the tenant to put improvements on the premises demised. Nothing is said therein concerning a situation, where as here, the tenant was specifically obligated to put them there. Further, the consideration for the lease passing to Jordan from the Brewing Company was not only the delivery to him of the 120 shares of stock, whose value undoubtedly was largely at that time speculative, and subsequently became worthless, but also that that Company should make designated repairs and improvements on Jordan's building. He exacted no other rental. Under such circumstances it must be held that in legal effect he himself agreed to pay the cost of the improvements and repairs made. There is ample authority supporting this view. See statement in the note appearing in 79 A. L. R. as given above and cases cited; also Mansfield Lumber Co. v. First State Bank of Vian, 147 Okla. 8, 293 Pac. 1079; Whitcomb v. Gans, 90 Ark. 469, 119 S. W. 676; Potter v. Conley, 83 Kan. 676, 112 Pac. 608; Artic Lumber Co. v. Borden, 211 Fed. (C. C. A. 9th Cir.) 50; Kremer v. Walton, 11 Wash. 120, 39 Pac. 374.

The owner urges that he received no "immediate benefit"—as the statute (66-523, supra) reads—from these improvements. We cannot perceive that this is

so. The building in question could not very well be used in the condition of disrepair it was in at the time the lease agreement was executed. When the Brewing Company had performed its agreement the owner would have a structure in usable condition once more, suitable for the purpose for which it was designed and unquestionably immediately more valuable and of benefit to him. It immediately became in a very substantial degree more rentable and more salable. It would appear also that the lessor of the building undoubtedly himself considered that the improvements to be made were of material benefit to him, for he required as a vital part consideration for the lease that they must be made by the lessee and also prescribed that if they were not made as directed, the option to purchase the property given the lessee would not be extended and the lease itself would be cancelled.

Considerable reliance seems to be put by the owner upon the case of Stewart v. Talbott, 58 Colo. 563, 146 Pac. 771. That case is easily distinguishable from the facts at bar in several respects. The lease there involved was for the term of ninety-nine years. In regard to leases of this character, counsel for the owner in their brief submitted here thus quite pertinently say: "In the case of a ninety-nine year lease, it is obvious that cursory repairs or anything short of the erection of a new building, and possibly even that, would be considered solely for the benefit of the lessee. The courts in deciding cases of that sort, invariably regard the lease as remaining unbroken for the 99-year period in the contemplation of the lessor, and thereby banish all thoughts of benefit from his mind." Additionally there was a provision in the lease reading:

"It is expressly understood and agreed (and notice is hereby given) that nothing herein shall authorize the lessee or any person dealing through, with, or under it to charge said lands, or any interest of the lessors

therein, or this lease, with any mechanic's lien, or lien or incumbrance of any kind whatever. On the contrary (and notice is hereby given), the right and power to charge any lien or incumbrance of any kind against the lessors, or their estate, is hereby expressly denied, and the lessee covenants that it will not permit or suffer any bill of any mechanic, laborer, or materialman, or for any furnishings or equipments of said premises, to be or remain unpaid."

This lease, too, was duly recorded in the office of the county clerk of the county where the leased land was situated, so that the mechanic's lien claimant had constructive notice thereof. No facts of this sort appear in the case at bar. We do not wish it understood, however, that we are holding now that such a contract provision would protect the owner as against the provisions of Section 66-501, supra. It is not necessary to decide the point at this time.

The case of Dierks & Sons Lumber Co. v. Morris et al., 170 Mo. App. 212, 156 S. W. 75, is also called to our attention, but there the lease, as in the Stewart v. Talbott case, supra, contained a provision against mechanics' liens for improvements authorized by the lessee, was for a term of ninety-nine years, and the repairs made were merely alterations in the building. The court points out that by the time the term would expire these improvements "will have decayed," saying also that the record did not show "that the value of the freehold has been enhanced for the purpose for which the lessor was using the property prior to the time of the lease." The court in affirming a judgment denying a mechanic's lien for such repairs nevertheless said:

"Where, by reason of the terms of the lease, the value and extent of the improvements, and the relative length of the term, it can be seen that the improvements substantially increase the value of the freehold interest primarily, and not merely as a future, inci-

dental matter, then the lien against the lessor's interest will be upheld, without regard to the language of the lease concerning liens."

We are asked to note, too, that the court in Deka Development Co. v. Fox, 170 Okla. 228, 39 Pac. (2d) 143, denied a mechanic's lien. But this was done because the lease did not obligate the lessee to make the improvements involved, but merely authorized him to do so. Citing previous Oklahoma decisions, the court quoted: " 'The rule of course is otherwise where, under the contract, the owner is obligated to reimburse the tenant for the cost of the improvements or where made for the primary benefit of the owner.' "

We do not mean to say that no authorities can be found under mechanics' lien statutes in some respects resembling ours which take different views from those above expressed as meeting our approval. We are of the opinion, however, that under facts such as we have before us, the legal principles which we think should be applied here are supported not only by the most authorities, but also by decidedly the better reasoning. Careful analysis of the mechanics' lien statutes of each jurisdiction is required as well to determine whether the decisions thereunder may be regarded as really persuasive in any degree.

It is argued for the owner that the Lumber Company was not an original contractor and was consequently required, under Section 66-508, W. R. S., 1931, to file its claim of lien within ninety days "after the indebtedness shall have accrued." The part of the statute relied upon in this connection reads:

"It shall be the duty of every original contractor, within four months, and every sub-contractor, and every journeyman and day laborer, and every other person seeking to obtain the benefits of the provisions of this article, within ninety days after the indebtedness shall have accrued, to file in the office of the reg-

ister of deeds of the proper county, a just and true account of the demand due him, her, or them, after all just credits shall have been given."

It is said that the Lumber Company must be regarded as included within the words of the quoted statute, "and every other person"; that one who supplies only material for a building cannot be regarded as an original contractor; that a formal, precise contract, stating exact amounts of material needed and prices to be paid, must be held by the one who may properly be designated as "an original contractor," under the statute, and that an implied contract is quite insufficient. These contentions, also, we are obliged to say are without merit.

In Ambrose Mfg. Co. v. Gapen, 22 Mo. App. 397, the court said:

"It is contended by appellants that the term original contractor, as used in the statute, has reference solely to those who may do service, by way of work, labor, or superintendence, upon the building.

"The point is not well taken. It has been specially ruled by our supreme court, that a material man may be an original contractor, and that he is, in fact, such contractor, if he furnish the material on a contract with the owner. Hearne v. Ry. Co., 53 Mo. 324."

And in the decision of the Supreme Court thus cited by the Missouri Court of Appeals we find this language:

"It is manifest that the plaintiffs were original contractors. The lumber was furnished under a contract with the company itself. It is true the president of the company transacted the business, but he was acting for, and on behalf of the company, and his contracts and acts were those of the company. A contract with the president was a contract with the company.

"Under this view, the plaintiffs were original contractors, and had six months in which to bring their suit."

The decision in the Hearne case was rendered in 1873

and some time before our Mechanics' Lien Law was adopted by the Territorial Legislature. The principle would seem applicable that a statute borrowed from the legislation of another state will be presumed to have been adopted with the construction placed upon it by the courts of that state. 59 C. J. 1065 and cases cited. In this connection see Darlington Lumber Co. v. Smith Building Co., 134 Mo. App. 316, 114 S. W. 77; Waters et al. v. Gallemore et al., (Mo. App.) 41 S. W. (2d) 870; East Arkansas Lumber Co. v. Bryant, 215 Mo. App. 452, 247 S. W. 496; J. H. Magill Lumber Co. v. Carter, (Mo. App.) 17 S. W. (2d) 581.

Courts in other jurisdictions having similar words to construe have taken the same view as that announced by the foregoing decisions. See Morris v. Bessemer Lumber Co., 217 Ala. 441, 116 So. 528; Gray v. Pumice Stone Co., 15 N. M. 478, 110 Pac. 603. And in Frieden-bloom v. Pecos Valley Lumber Co., 35 N. M. 154, 290 Pac. 797, the court, discussing who may be regarded as "owner" and "original contractor" within the meaning of those words in the Mechanics' Lien Law of that state, said that the word "owner" "means the party in interest who is the source of authority for the improvement. One who deals with such a party directly is contracting with the 'owner,' and is not a subcontractor, but is an 'original contractor.' Albuquerque Lumber Co. v. Tomei, 32 N. M. 5, 250 P. 21; Mitchell v. McCutcheon, 33 N. M. 78, 260 P. 1086; Boyer v. Keller, 258 Ill. 106, 101 N. E. 237, Ann Cas. 1916B, 628; Builders' Supply Co. v. Eggman, 190 Ill. App. 572; Colorado Iron Works v. Riekenberg, 4 Idaho, 262, 38 P. 651; 18 R. C. L. 'Mechanics' Liens,' par. 39. There was no error in the ruling complained of."

Section 66-501, supra, it will be recalled, refers to "any contract with the owner or proprietor" of the land, "or his or her agent, trustee, contractor or subcontractor," as the source of authority through which

a mechanic's lien is granted by the law. It does not say "written contract," "express contract," "formal contract," or "contract covering labor and materials and superintendence." An implied contract is, in our judgment, amply sufficient upon which to base a mechanic's lien. See Bernard v. Hassan, 60 Ore. 62, 118 Pac. 201; 40 C. J. 115, and cases cited in Note 34. No valid reason that we can see has been advanced why a different sort of contract is contemplated under the provisions of Section 66-508, supra, from that prescribed in the preceding Section 66-501. No statutory language can be found in either of these sections which would lead us to think so. Both deal with the subject of mechanics' liens, Section 66-501 being the original section of the law which provides for the existence of a lien, and Section 66-508 being but one of the sections prescribing the procedure which must be taken to establish it. The Lumber Company was an original contractor, and having filed its claim of lien within four months after the indebtedness accrued in this case, the lien claim was filed in time.

Something, however, is said to the effect that the contract in evidence between the Brewing Company and Thimmig established that he was the "original contractor," but the record makes it plain that this contract was utterly unknown, either constructively or actually, to the Lumber Company during all the time it was furnishing materials to the lessee. The contract itself was not even recorded. The materials furnished by the Lumber Company were charged to the Brewing Company. Ladbury, the Lumber Company's Secretary-Treasurer, who dealt with Thimmig, says that the materials were delivered to the Brewing Company. Thimmig was admittedly the General Manager of the Brewing Company during all the period the deals were being made. He seems never to have complained that the materials were charged to the wrong party. Lad-

bury stated in his testimony that Thimmig told him that the Brewing Company had purchased the property. Indeed, the evidence is in an extremely hazy condition as to whether Thimmig ever performed his contract. Of course, in the face of the trial court's finding in favor of the Lumber Company, under such circumstances, we could not now say that Thimmig was the "original contractor" even if we were inclined to think there was some evidence to support that view. Additionally, we hardly conceive it to be the law that a corporation may deal with another through its general manager, and then undertake to claim rights against such third party in connection with those dealings, relying upon a secret contract between only it and its officer.

It is insisted that Section 66-521, W. R. S., 1931, was not complied with by the Lumber Company. That section reads:

"Every person, except the original contractor, who may wish to avail himself of the benefits of the provisions of this article, shall give ten days' notice, in writing, before filing the lien, as herein required, to the owner, owners or agent, or either of them, that he or they hold a claim against such building or improvement, stating in said notice the amount of the same and from whom it is due."

Holding as we do that the Lumber Company was the "original contractor" disposes of this contention. But it may not be amiss, perhaps, to call attention to the pertinent language quoted by counsel for the Lumber Company from Waters v. Gallemore, supra, where the court said:

"There was no call for a notice of a lienable demand on the part of these plaintiffs in order to warn the owner against paying a contractor. The owner made the contracts himself with the plaintiffs and knew of his obligation to them. Bruner Granitoid Co. v. Klein, 100 Mo. App. 289, 73 S. W. 313."

The purpose subserved by the section of the statute last quoted is distinctly stated in P. M. Bruner Granitoid Co. v. Klein, 100 Mo. App. 289, 73 S. W. 313, thus:

"The main object of the preliminary notice of a lienable demand which the statute requires a sub-contractor to give to a property owner is to warn the latter against paying the original contractor while outstanding claims exist in favor of laborers and materialmen. Henry v. Plitt, 84 Mo. 237; Fruin-Bambrick Const. Co. v. Jones, 60 Mo. App. 1; Miller v. Hoffman, 26 Mo. App. 199."

It logically follows from the views hereinbefore expressed that as the Brewing Company, with which the Lumber Company dealt through the former's manager, Thimmig, was Jordan's agent, there was no need of any notice to be given by the Lumber Company, such as is required by Section 66-521, supra. Under familiar law, both Jordan and the Brewing Company were legally chargeable with knowledge of the Lumber Company's claim.

Error is asserted on behalf of the owner in that the court excluded the testimony of the witness Ogden, who was counsel for the Brewing Company and a director "for a while," when it was undertaken to prove by him that Thimmig had gone ahead and performed his contract with the Brewing Company. But the witness testified as follows on his direct examination:

"Q Will you state to the Court what he was doing, so far as your knowledge was concerned?
A Why, Mr. Thimmig—my knowledge of what he was doing was mostly from what he would tell me, occasionally corroborated by what others would tell me.
Q In other words, you didn't follow him around to find out what he was doing.
A No."

Whereupon the court ruled: "I think it is quite conclusively shown that he can't tell."—to which one of counsel for the owner, who was at the time conducting the

examination of the witness, responded: "That is very true." There was no error in the ruling.

Having disposed of all the points raised which we deem material to consider in disposing of this case, we conclude, therefore, that the judgment rendered by the district court of Natrona County and questioned by these proceedings was correct, and that it should be and is affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.