391 A.2d 66.

RICE MACHINERY, INC. *v.*
JOHN H. NORBERG, *Tax Administrator.*

JULY 24, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. We have issued a writ of certiorari pursuant to the pertinent provisions of the Administrative Procedures Act, G.L. 1956 (1977 Reenactment) ch. 35 of title 42, in order that we may review a judgment entered in the

Superior Court that affirmed a decision by the tax administrator assessing a deficiency determination as to certain sales taxes due the state from the petitioner, Rice Machinery, Inc. (Rice). The deficiency results from Rice's failure to include within its tax computations certain freight charges collected from its customers. The narrative which follows is based on what transpired at a hearing held before a Division of Taxation hearing officer.

Rice is a Rhode Island corporation engaged primarily in the business of selling highly priced, customized industrial machinery and machine tools. Its plant is located in Cranston. In this facet of its operation, Rice acts as a sales representative for a number of machinery manufacturers located outside of the state. Through its salesmen or by competitive bidding, Rice, in consultation with a manufacturer, quotes a price to a potential purchaser of a piece of machinery. In the typical situation the machinery desired by the buyer must be specially manufactured or tailored to meet the buyer's needs. If the buyer indicates a willingness to purchase, a price is established, and Rice accepts the order on behalf of the manufacturer. The price set by Rice does not include transportation charges from the manufacturer's factory to the place designated by the purchaser for delivery. Thereafter, Rice sends its purchase order to the manufacturer, who engineers the equipment to satisfy the particularized needs of the buyer.

When the product is complete, the manufacturer ships the machine by common carrier f.o.b. its factory. Ordinarily, the machinery is delivered directly to the purchaser's place of business. Occasionally, the product is shipped to Rice. This diversion can take place for a variety of reasons, but it usually occurs when Rice must add certain accessories to the machinery or prepare it for installation. After Rice has completed this phase of the transaction, Rice or the customer makes arrangements for delivery to the buyer's plant.

About 10 days after the machinery has been installed in the

purchaser's establishment, one of Rice's sales personnel procures a certificate from the customer which indicates that the machinery meets the contract specifications and is performing satisfactorily. Rice then sends to the buyer an invoice setting forth the amount due. The invoice itemizes the agreed-upon purchase price, transportation charges, and Rhode Island sales tax computed solely on the purchase price. The freight charges included in the invoice may, depending upon the circumstances, actually be a combination of different items. In all cases the sum includes the cost of shipment from the manufacturer's factory to either Rice or the purchaser, whichever the case may be. Furthermore, if the machinery was originally shipped to Rice, the transportation charges would also include Rice's cost of moving the machinery from its shop to the customer's plant. In the meantime, the manufacturer has billed Rice for the full purchase price minus Rice's percentage commission plus the freight cost from the factory. Usually, Rice pays the manufacturer prior to receiving remuneration from the purchaser.

In his decision the hearing officer pointed out that the operative statute, G.L. 1956 (1970 Reenactment) §44-18-12(E), exempts from the sales tax "[T]ransportation charges separately stated, if the transportation occurs after the purchase of the property is made." He then took note of regulations issued by the tax administrator which established detailed guidelines as to the application of §44-18-12(E).[1] In particular, he pointed to a regulation entitled "Delivery by Carrier," which provides that the tax shall not apply to separately stated transportation charges if the goods are shipped by common carrier directly to a place specified by the purchaser unless the sales contract states that title to the goods shall not pass until actual delivery to the place specified by the buyer. Based upon this regulation, the hearing officer

---

[1]The regulations in question were originally issued by the tax administrator in December 1963 and can now be found in *Regulations and Rules Issued by the Tax Administrator under the Sales and Use Tax Law* at 47 (1977 ed.).

found a notation on Rice's business invoices specifying that title did not pass to the buyer until payment had been made in full. The hearing officer considered this proviso decisive despite testimony by Rice's chief executive that the invoice notation was only intended as a scare tactic and that it was universally understood within the trade that title to the machinery passed at the time it was shipped from the manufacturer. The hearing officer, therefore, found that the deficiency assessment was proper.

The tax administrator adopted in toto the factual findings and conclusions of law made by the hearing officer. Subsequently, Rice filed a petition for review in the Superior Court.[2] In mid-1976 the trial justice rendered his decision affirming the tax adminstrator's findings. His approach to the issues presented in the case differed, however, from that taken on the administrative level. In the trial justice's view, the critical inquiry under §44-18-12(E) was the time title to the goods passed under G.L. 1956 (1969 Reenactment) §6A-2-401 of the Uniform Commercial Code. The trial justice's reading of this provision led him to conclude that title did not pass until the buyer received the machinery and, therefore, the transport had been completed prior to the purchase. The dispute between Rice and the tax administrator, in essence, involves the single question of whether the machinery was transported to the customer before or after the "purchase."

The word "purchase" is not defined in the Sales and Use Tax Act[3] and is used with reference to the sales tax only once — §44-18-12(E). In all other instances, the Legislature has employed the term "sale" to identify the determinative event

---

[2] At the time this action arose, judicial review of the tax administrator was to the Superior Court under G.L. 1956 (1969 Reenactment) §42-35-15. This section was amended in 1976 so that now judicial review is had by petitioning the Sixth Division of the District Court rather than the Superior Court. P.L. 1976, ch. 140, §20; P.L. 1976, ch. 140, §27.

[3] General Laws 1956 (1970 Reenactment) ch. 18 of title 44.

regarding sales tax liability or lack thereof. Why the General Assembly chose to use "purchase" in §44-18-12(E) rather than "sale" is somewhat puzzling, especially since "sale" could be inserted in place of "purchase" and thereby maintain a degree of internal consistency in the Sales Tax Act.[4] Our function in interpreting the meaning of the word is, however, no different from when this court is called upon to construe any law to ascertain the legislative intent. In doing so, we assume that the Legislature intended to give words their ordinary and customary meaning in the context within which they are used unless to do so would be at odds with a contrary intent clearly appearing on the face of the statute. *Bristol County Water Co.* v. *Public Utilities Commission*, 117 R.I. 89, 363 A.2d 44 (1976); *Potowomut Golf Club, Inc.*, v. *Norberg*, 114 R.I. 589, 337 A.2d 226 (1975); *Andreozzi* v. *D'Antuono*, 113 R.I. 155, 319 A.2d 16 (1974).

"Purchase" is a multi-faceted term. Its meaning depends upon the context in which it is used. It can refer to any and all modes of acquiring real estate other than by descent.[5] A "purchase" can occur when there is a binding agreement to pay at an agreed price.[6] "Purchase" also described a wide variety of transactions in which title to property is voluntarily transferred from one individual to another for consideration.[7] A "purchase" has also been construed to be a synonym for a "trade,"[8] but not for a "lease."[9]

---

[4]"Purchase" is also used as a verb in either the present or past tense several times in the Use Tax Act. *See* sections 21, 25, 28, 29, 30(H), 35 and 36 of ch. 18 of title 44. A reading of these provisions reveals that the same interpretive problem is involved. However, because the use tax is imposed upon the use or consumption of goods in the state, the issue of when a "purchase" occurs is not a significant factor in most cases. The context in which "purchase" is used in the Use Tax Act is, therefore, of no assistance to us in interpreting §44-18-12(E).

[5]*See Oklahoma City* v. *Board of Educ.*, 181 Okla. 539, 75 P.2d 201 (1938).

[6]*First Nat'l Bank & Trust Co.* v. *United States*, 462 F.2d 908 (10th Cir. 1972).

[7]*Shepard Paint Co.* v. *Board of Trustees*, 88 Ohio App. 319, 100 N.E. 2d 248 (1950).

[8]*Allen* v. *Webb*, 87 Nev. 261, 485 P.2d 677 (1971).

[9]*Angel* v. *Behnke*, 337 N.E. 2d 503 (Ind. App. 1975).

It should be obvious that our embracing one, some, or all of these definitions would be of little help in our present task. The "real property" concept is inapplicable so far as the acquisition of title is concerned because the imposition of the sales tax relates solely to transactions involving tangible personal property. If we adopt the "transfer of title" approach, we would be limiting the exception to freight charges assessed post transfer of title. Such a view overlooks the well-known fact that there are a number of situations in which parties participate in transactions involving tangible personal property in which the purchaser's ultimate interest in the cargo may be something less than absolute ownership. Those transactions are, nevertheless, taxes as sales under §44-18-7(A), which defines a sale as

> "Any transfer of title or *possession, exchange, barter, lease or rental*, conditional or otherwise, in any manner or by any means of tangible personal property for a consideration." (Emphasis added.)

Presumably, since these transactions are subject to the same degree of taxation, the Legislature also intended to make the §44-18-12(E) exemption available to the parties for transportation charges incurred subsequent to the transfer of "possession," "the exchange," "the barter," "the lease," or "the rental" of whatever the cargo may consist.

Likewise, interpreting "purchase" as meaning the creation of enforceable contractual right would, especially when the operative taxable event is the transfer of title or possession, exempt as a matter of routine, transporation charges from the sales tax that would otherwise be due on a substantial portion of transactions. Such an exemption would do violence to the well-recognized principle that all transactions are taxable unless specifically exempted. We must keep in mind that §44-18-12(E) is an exemption provision and as such is to be strictly construed against the taxpayer unless the legislative intent to grant such an exemption is clear on the face of the statute. *Great Lakes Dredge & Dock Co.* v.

*Norberg*, 117 R.I. 600, 369 A.2d 1101 (1977); *Sportfisherman Charter, Inc.* v. *Norberg*, 115 R.I. 68, 340 A.2d 143 (1975); *Preservation Society* v. *Assessor of Taxes*, 99 R.I. 592, 209 A.2d 701 (1965). In this instance the isolated use of the word "purchase" in the Sales Tax Act fails to satisfy us that the Legislature wished to provide so sweeping an exemption.

We believe that the transportation charge exemption can be properly construed if we recognize that the General Assembly, in its use of the word "purchase," never intended to change the focal point of the Sales Tax Act from a "sale" to either a more expansive or restrictive conceptual basis for tax liability. Even in common parlance, "sale" and "purchase" are often used interchangeably. Unless "purchase" is construed so as to bring it into conformity with the statutory definition of "sale," the exemption will be out of joint with the legislative framework erected by the General Assembly when it enacted the sales tax law.

The substitution of one word for another in a statute is a delicate tool available to the judiciary, which, if properly and prudently used, will better fulfill the purpose of the statute. *Town of Scituate* v. *O'Rourke*, 103 R.I. 499, 239 A.2d 176 (1968). With this principle in mind, we will construe the word "purchase" as used in §44-18-12(E) to be synonymous with the meaning of "sales" as the latter term is defined in §44-18-7.

Pursuant to §44-19-33, the tax administrator has promulgated regulations which interpret when the §44-18-12(E) exemption is available to a retailer. Under the heading of "Delivery Charges," there are four regulations (A through D) whose application is intended to identify when a "sale" in a delivery situation is complete for purposes of the Sales Tax Act. According to the regulations, determining when delivery charges are subject to taxation depends upon several factors including the status of the carrier who transports the goods, the type of sale involved, and the parties' representations regarding the locus of title at the time the goods are

placed in transit. As an administrative construction of a statute by the agency charged with the responsibility of enforcing the statute, the regulations are prima facie evidence of the statute's proper construction which will be considered controlling by this court unless the interpretation is clearly erroneous or unauthorized. *Brier Manufacturing Co.* v. *Norberg,* 119 R.I. 317, 377 A.2d 345 (1977); *Flather* v. *Norberg,* 119 R.I. 276, 377 A.2d 225 (1977); §44-19-33.

The first of the regulations, "A," entitled "Delivery by Carrier," states that the sales tax does not apply to "charges for transportation of property from the retailer's place of business or other point from which shipment is made directly to a place specified by the purchaser, provided the transportation is by other than facilities of the retailer, i.e., independent contract or common carrier, United States mail." However, the freight costs will be taxable if the terms of the parties' contract provide that "title does not pass until actual delivery to the place specified by the buyer."

On the other hand, regulation "B" subjects transportation charges to a tax if the retailer uses his own facilities to deliver the goods unless "the transportation occurs after title to the property has passed to the purchaser * * *."

The third regulation, "C," concerns a sale of goods for a delivered price. When this is the manner of sale, transportation charges are taxable. In the event the shipment occurs after title to the property has passed to the purchasers, there is no tax.

Regulation "D" sets forth several principles for determining when title to goods passes. In those instances where the goods are delivered by facilities operated by the retailer or are sold for a delivered price, "title will not be considered as passing to the purchaser until the goods reach the place specified, in the absence of clear and convincing evidence that both retailer and buyer intended that title should pass at some other place." Furthermore, when delivery is achieved

by means of the retailer's truck, the parties' intent to pass title to the goods prior to delivery "should be clearly expressed in writing constituting a part of the contract of sale" executed prior to the time of shipment.

We believe that the regulations are in accord with the intent and purpose of §44-18-12(E) and, therefore, must be applied in this case. By focusing upon when title passes and when possession of goods is transferred, the regulations track the statutory definition of "sales" that is found in §44-18-7 and incorporate within their terms the delivery charge exemption.

However, as observed by the trial justice, the regulations are not, by their own terms, meant to stand alone since they provide, in certain circumstances, for reference to existing contract principles. For example, regulation "A" states that freight charges incurred in shipping goods by common carrier are not taxable *unless* the parties' contract specifies that title does not pass until actual delivery to the place designated by the buyer. Construing whether a particular contract provision was intended to affect title will often necessitate interpretation of terminology which has its roots in substantive contract law.

At the time §44-18-12(E) was enacted in 1947, the applicable contract principles which the Legislature was dealing with were those common law doctrines then in vogue. By the time the tax administrator's regulations on delivery charges were issued in 1963, common law concepts of the commercial world had been supplanted by the Uniform Commercial Code.[10] While we have some doubts whether the regulations make reference to the Code as that body of contract law which should apply when applicable, we can perceive no

---

[10]The Rhode Island version of the Uniform Commercial Code was enacted at the General Assembly's January 1960 session. P.L. 1960, ch. 147. Its provisions were to be applicable to all transaction entered into on and after January 2, 1962. P.L. 1960, ch. 147, §6.

reason why, when a question arises under the regulations as to contract interpretation, we should not employ the Code as our frame of reference. In doing so, we adhere to the current realities of the marketplace and will, therefore, be better able to gauge the parties' intent in those instances where intent is decisive under the regulations.

Application of the regulations to Rice's business dealings requires us to differentiate between two means by which a piece of machinery winds its way through the stream of commerce toward its final destination — the buyer's place of business. The machines may either by shipped from the manufacturer directly to the purchaser, or they may be sent to Rice's Cranston plant when the circumstances dictate. When the parties have agreed that a machine will be sent to the purchaser, the product is shipped by common carrier f.o.b. the manufacturer's factory. Under regulation "A" concerning delivery by common carrier, freight charges billed to the purchaser for transit by common carrier are exempt from the sales tax under §44-18-12(E). The tax administrator, nevertheless, imposed a tax upon these delivery charges relying upon that portion of regulation "A" which provides that the charges are taxable if the parties' contract provides that title will not be transferred until the goods are delivered to the specified destination. The reason for the administrator's decision was the boilerplate clause in Rice's business invoices which provides that title to the machinery did not pass until payment was received.

We must disagree with the administrator's interpretation of the significance of Rice's invoice notation. The record clearly shows that the invoice was sent to a customer only after the machine had been in place at the customer's shop for about 10 days. The invoice was never signed by the buyer, was not a part of the contract of sale, and merely served as a formal bill setting forth the agreed-upon price for the product and itemizing other charges such as transportation and, in certain cases, Rice's labor in customizing or

installing the machinery. Each purchaser's sales contract was executed at the time the machinery was ordered from the manufacturer. In fact, the president of Rice testified at the administrative hearing that the only contractual terms bearing upon transfer of title were those specifying that shipment was to be made by common carrier f.o.b. the factory.

As we have just noted, under the regulations interpretation of contract terms is to be made by reference to current contract law in the commercial setting, which for our purpose is the Uniform Commercial Code. Looking to the Code for guidance, we find that the f.o.b. term in the contract identifies the mode of transit as a "shipment contract." Section 6A-2-504; *Colony Press, Inc.* v. *Fleeman,* 17 Ill. App. 3d 14, 308 N.E. 2d 78 (1974); *Eberhard Manufacturing Co.* v. *Brown,* 61 Mich. App. 268, 232 N.W. 2d 378 (1975); *Dana Debs, Inc.* v. *Lady Rose Stores, Inc.,* 65 Misc. 2d 697, 319 N.Y.S. 2d 111 (Civ. Ct. N.Y. 1970). Under §6A-2-401(2) when delivery is by "shipment contract," title passes to the buyer at "the time and place of shipment." *In re Bosson,* 432 F. Supp. 1013 (D. Conn. 1977); *William F. Wilke, Inc.* v. *Cummins Diesel Engines, Inc.,* 252 Md. 611, 250 A.2d 886 (1969). Thus, in cases of direct shipments to Rice's customers, the parties' title to the machinery passes to the customer prior to shipment when the goods are placed on the manufacturer's loading dock. The freight charges in such shipments are, therefore, tax exempt under §44-18-12(E) and regulation "A."

The trial justice correctly categorized the contract provision regarding deliveries as calling for a "shipment contract," but, in determining the legal significance of this form of transit, he found that Rice retained ownership of the machinery until actual delivery to the buyer. This ruling is contrary to the clearly expressed passage-of-title provisions of §6A-2-401(2). Consequently, insofar as the trial justice upheld the tax of transportation charges in direct shipments to purchasers, his decision is reversed.

The record also indicates that occasionally another route was employed to ship machinery from the manufacturer to the purchaser. This alternative means of shipment also involved a common carrier who received the machinery f.o.b. the manufacturer's factory, but, instead of delivery to the purchaser, the carrier would transport the product directly to Rice's Cranston facility. While the evidence established that there might be any number of reasons for the manufacturer's shipment going directly to Rice, in most instances the shipments were sent to Cranston so that Rice could customize the machinery or prepare it for installation. A typical situation would come about because the manufacturer would refuse to accede to what it considered to be unreasonable demands of a customer. When it was apparent that the manufacturer had reached the point of no return, Rice, reluctant to lose a sale and ever ready to please a customer, would agree to install the extras. After Rice had completed its job, it would then reach an understanding with the customer relative to the delivery of the finished product.

A superficial reading of regulation "A" seems to support its application in this species of transaction. Direct shipments to Rice were accomplished by means of common carrier, the f.o.b. delivery term in the contract suggests that the parties agreed to have title pass prior to shipment when the goods placed in the hands of the carrier, and Rice's president testified that the understanding in the trade was that title passed on manufacturer's loading dock. We believe, however, that an examination of this type of transaction in light of the statute and the regulations leads to the conclusion that delivery charges in such a situation are taxable.

Implicit in both §44-18-12(E) and the tax administrator's delivery charge regulations is that delivery to the purchaser is the facet of a business transaction to which the exemption is directed. The regulations articulate this by noting that the charges which are governed by §44-18-12(E) are only those for transportation of goods "to a place specified by the pur-

chaser." Consequently, only transportation charges arising from a retailer's attempt to complete his delivery obligation to the purchaser after the "sale" are exempt from the sales tax.

A review of the instances when Rice has had the machinery sent to Cranston reveals that such transactions were undertaken not to effectuate delivery to the purchaser but are made to complete production by rendering the machinery fit under contract specifications. We fail to see how Rice can claim relief under §44-18-12(E) and the regulations when Rice has not yet attempted to deliver the machinery to the purchaser.[11]

The tax administrator included within his deficiency assessment sums relating to these charges, and we now uphold his determination of the tax liability stemming from these costs.

It can be argued, however, that regulation "A" states that shipment may be made to a place specified by the buyer, and in this case, it just happened to be Rice. While we do not doubt that delivery may be made to a place other than the purchaser's facility, as for example to his agent or site where the machinery will be used, an application of the regulation would not be in keeping with what we perceive to be the underlying intent of the exemption provision and the regulations. That is, the transportation charges which are subject of the exemption are those incurred to effectuate delivery of the goods from the retailer to the purchaser.

After Rice has completed the additional tasks required to

---

[11]Occasionally a shipment to Rice was made solely for the convenience of the purchaser. Rice's president provided an example. A customer had ordered a "pretty good size" piece of equipment. When the machinery was due from the manufacturer at the buyer's establishment, the customer had closed down its plant so its employees could enjoy their annual vacation. While the machinery was in transit, Rice somehow had the shipment diverted to its receiving dock. Once the customer reopened, Rice reported its interception. In such a case Rice had attempted to effectuate delivery, and, therefore, transportation charges from the manufacturer would qualify for the §44-18-12(E) exemption.

be done at its Cranston plant, the only matter left unresolved is the delivery of the machinery to the customer. Completion of this phase of the transaction may or may not call for an additional tax. The machinery can be transported from Cranston to the customer by any one of three means: by common carrier, Rice's truck, or the purchaser's vehicle. When the purchaser makes the pickup, there is, of course, no charge, and the issue of taxation does not arise. However, when the other modes of shipment are utilized, the regulations must once again be referred to to determine Rice's tax liability.

From our earlier discussion of regulation "A," there can be no question that the sales tax does not apply when delivery is made by common carrier unless the contract reserves title in Rice until after delivery. The proviso to regulation "A" regarding a contract provision reserving title in the retailer does not come into play in this case since the undisputed testimony of Rice's president established that no reservation appeared in the sales contract.

When Rice uses its vehicle to deliver the finished product, regulations "B" and "D" are the sources for assessing the taxation of these charges. Regulation "B" states that transportation charges are taxable unless shipment occurs after title to the goods has passed to the buyer. Regulation "D" sets forth rules regarding the passage of title. The pertinent part of the regulation "D" states that title will not be considered as passing to the purchaser until the goods reach the place specified. However, the parties may agree that title will pass at some earlier point, in which case they should express their intent on this matter in a "writing constituting a part of the contract of sale."

On this facet of the case, Rice presented no evidence about whether a written contract provision related to title. While Rice's president testified that the practice in the trade was to have title pass at an earlier point than actual delivery to the purchaser, such a tacit understanding between businessmen does not satisfy the writing requirement of the regulations.

Therefore, transportation charges for a delivery from Rice to the buyer via Rice's vehicle are subject to tax.[12]

Since we have detailed the variety of ways in which the machinery reaches Rice's customers and their different tax consequences, it might be well, before concluding this opinion, to recapitulate:

(1) Transportation charges involving machinery shipped f.o.b. the manufacturer by common carrier directly to the customer — tax exempt;

(2) Transportation charges involving machinery shipped f.o.b. the manufacturer by common carrier directly to the customer but intercepted by Rice as a matter of convenience for the customer — tax exempt;

(3) Transportation charges involving machinery shipped from the manufacturer to Rice for additional work — taxable;

(4) Transportation charges involving machinery shipped from Rice to the customer by
(a) Rice — taxable
(b) common carrier — tax exempt when the sales contract does not reserve title in Rice after the delivery.

In accessing the tax deficiency against Rice, the tax administrator used too broad a brush. Obviously, the delivery-charge exemption must be applied on an ad hoc basis. Eligibility for the exemption can only be determined after a consideration of such factors as (1) the parties' sales contract;

---

[12]We would note that the rules relating to the transfer of title under the regulations do not necessarily comport with §6A-2-401 of the Uniform Commercial Code on the same subject. Earlier we referred to the Code when a matter of contract interpretation was in issue because the regulations directed us to substantive contract law. However, when an administrative agency has interpreted the parameters of particular statutory terms in a field over which it has been given authority, it is not bound by the meaning ascribed to similar concepts in the Code. See §6A-2-401, Comment 2. As long as the agency's regulation is in line with the statute, as we have found it to be in this case, the agency is free to delineate specific areas of the statute's application.

(2) the route taken by the machinery before it reaches the customer or the destination specified by the customer; (3) the identity of the carrier; and (4) the contract of carriage. The sales contract, the route, the carrier's identity, and the carriage terms can be diverse and varied. Such diversity and differences may require differing tax treatment under the statute and the regulations. Segregating delivery charges under the taxable and exempt categories may be done in the Superior Court, or it may best be done at the administrative level. The decision in this regard should be made by the trial justice after remand.

The petition for certiorari is granted, the judgment of the Superior Court quashed, and the records certified to us are ordered sent back to the Superior Court with our decision endorsed thereon.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

*Paul C. Borges,* for petitioner.

*Julius C. Michaelson,* Attorney General, *Allen P. Rubine,* Assistant Attorney General, *Perry Shatkin,* Chief Legal Officer (Taxation), for respondent.