2011 WY 76

**MAVERICK MOTORSPORTS GROUP, LLC, Appellant (Petitioner),**

v.

**DEPARTMENT OF REVENUE, State of Wyoming, Appellee (Respondent).**

No. S–10–0220.

Supreme Court of Wyoming.

May 3, 2011.

Representing Appellant: John M. Kuker and James M. Peterson of Romsa & Kuker, LLC, Cheyenne, Wyoming. Argument by Mr. Kuker.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; and William F. Russell, Senior Assistant Attorney General. Argument by Mr. Russell.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, JJ., and PARK, D.J.

PARK, District Judge.

[¶ 1] This is a case about whether a Wyoming dealer must pay sales tax on sales of recreational vehicles to out-of-state buyers. The Appellant, Maverick Motorsports Group, LLC (hereinafter "Maverick"), challenges a decision of the State Board of Equalization (hereinafter "SBOE") that certain sales by Maverick were subject to Wyoming sales tax. Maverick petitioned for judicial review, and the District Court affirmed the SBOE's decision. In this appeal, Maverick challenges the SBOE's decision which held that sales by Maverick were subject to Wyoming sales tax and that imposition of Wyoming sales tax did not violate Art. 1, § 8, of the United States Constitution (the Commerce Clause).

[¶ 2] We affirm the SBOE's decision.

## ISSUES

[¶ 3] The following issues are presented on appeal:

I. Whether sales of recreational vehicles were taxable in Wyoming because possession was transferred in Wyoming.

II. Whether enforcement and collection of Wyoming sales taxes violate the Commerce Clause, Art. 1, § 8, of the United States Constitution.

## FACTS

[¶ 4] Maverick was formed in 2005 to purchase the assets of an existing business. Justin Johnson (hereinafter "Johnson") is the company president. Maverick operates stores in Cheyenne and Laramie, Wyoming. Both stores had sales tax licenses and both sold motorcycles, all-terrain vehicles (ATVs), snowmobiles, and various accessories. The parties agree that many of Maverick's customers lived in other states. Johnson had been informed by the previous owner that no Wyoming sales tax would be due for sales to nonresidents if the invoices were marked "delivered out of state"; so Maverick marked invoices in that manner and did not collect Wyoming sales tax. The Department of Revenue (hereinafter "Department") conducted audits of both stores for the period including June 2005 through September 2006. The Department concluded that sales tax was due from both stores. Maverick objected to both audits, and these objections were consolidated into one hearing before the SBOE. Maverick and the Department continued to work together up to the date of the hearing and came to an agreement on several issues. By the time of the hearing, the only issues were whether Wyoming could collect sales tax on sales of recreational vehicles to nonresidents; and, if so, did this tax violate the Commerce Clause.

[¶ 5] The vehicles were transferred in three ways: most were picked up by the purchaser at one of the stores, some were delivered by a common carrier selected by the purchaser, and some were delivered by Maverick. Maverick would mail any documents necessary to title or register the vehicle to the buyer a few weeks after the sale.

These documents were retained, in part, to ensure that the buyer's check would clear the bank. In some cases, the documents were mailed to the buyer's financier.

[¶ 6] The SBOE's primary concern about vehicles delivered by Maverick was a lack of documentation. The SBOE, although critical of Maverick's recordkeeping, agreed that Maverick had provided adequate proof and ruled that most of these sales were "destination sales" where transfer of title or possession took place outside Wyoming and no sales tax was due. The Department did not appeal this ruling. In addition, there were some instances where Maverick had no documentation to prove how the vehicle was delivered, and the SBOE affirmed the Department's finding. Maverick did not appeal from this part of the SBOE's decision.

[¶ 7] The majority of the sales involved customers who came to one of the stores, picked up the vehicle and then returned to their home state with the purchase. Maverick refers to these as "self-deliveries." Maverick asserted that the parties intended to transfer possession in the buyer's home state; the Department countered that the record did not support this assertion.

[¶ 8] In some sales, Johnson testified that Maverick would recommend a common carrier to the buyer, and then the buyer would contract directly with the carrier. The SBOE found that delivery to the carrier was the equivalent of delivery to the buyer and that there was no contract or other evidence that the parties intended that Maverick would be responsible for the goods until delivery was complete.

[¶ 9] Maverick and the Department entered into a stipulation that Maverick did not have to contact any of its customers to obtain documentation that the customer had paid sales or use tax in another state. The Department agreed to this because it asserted that its only contention was that the State of Wyoming was entitled to the tax.

[¶ 10] The SBOE found that possession of the vehicles was transferred to the buyer in Wyoming; therefore, Wyoming sales tax was due. In general terms, the question before the Court is whether the SBOE's decision is supported by substantial evidence and not arbitrary or capricious, or otherwise contrary to law.

## STANDARD OF REVIEW

[¶ 11] Our standard of review is well-established. We give "no special deference to the district court's decision" in considering appeals from district court reviews of administrative actions, but instead review the case as if it had come directly from the administrative agency. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008). Reviews of an administrative agency's action are governed by the Wyoming Administrative Procedure Act, which provides in pertinent part that the reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009).

[¶ 12] Questions of law are reviewed *de novo,* and "'[c]onclusions of law made by an administrative agency are affirmed only if they are in accord with the law. We do not afford any deference to the agency's determination, and we will correct any error made by the agency in either interpreting or applying the law.'" *Bowen v. State, Dep't of Transp.,* 2011 WY 1, ¶ 7, 245 P.3d 827, 829 (Wyo.2011) (quoting *State ex rel. Workers' Safety & Comp. Div. v. Garl,* 2001 WY 59, ¶ 9, 26 P.3d 1029, 1032 (Wyo. 2001)).

[¶ 13]  We give "considerable deference" to the agency's findings of fact and do not disturb them unless they are "contrary to the overwhelming weight of the evidence." *EOG Resources, Inc. v. Wyo. Dep't of Revenue*, 2004 WY 35, ¶ 12, 86 P.3d 1280, 1284 (Wyo.2004).  This Court reviews the entire record of an agency's decision for substantial evidence, and it will determine if there is relevant evidence that a reasonable mind might accept in support of the agency's decision.  *Herrera v. State ex rel., Wyo. Workers' Safety & Comp. Div.*, 2010 WY 103, ¶ 9, 236 P.3d 277, 281 (Wyo.2010).

[¶ 14]  The scope of our review is controlled by Wyo. Stat. Ann. § 39–11–109 and § 16–3–115.  Section 39–11–109(b) [1] provides:

(i) Any person aggrieved by any final administrative decision of the department may appeal to the board.  Appeals shall be made in a timely manner as provided by rules and regulations of the board by filing with the board a notice of appeal specifying the grounds therefor.  The department shall, within a timely manner as specified by board rules and regulations, transmit to the board the complete record of the action from which the appeal is taken;

(ii) Any person including the state of Wyoming aggrieved by any order issued by the board, or any county board of equalization whose decision has been reversed or modified by the state board of equalization, may appeal the decision of the board to the district court of the county in which the property or some part thereof is situated[.]

Section 16–3–115 provides for Supreme Court review of the district court:

An aggrieved party may obtain a review of any final judgment of the district court under this act by appeal to the supreme court.  The appeal shall be taken as in other civil cases.

## DISCUSSION

### 1. *Was sales tax due in Wyoming?*

[¶ 15]  There are two types of sales at issue.  The first includes sales in which out-of-state buyers would pick up a vehicle from

Maverick at either the Cheyenne or Laramie store and return with the vehicle to their home state.  The second includes sales in which a common carrier, acting on behalf of the out-of-state buyer, would pick up the vehicle from Maverick and deliver it out of state.  Maverick contends that these sales were "non-taxable destination" sales and not subject to Wyoming sales tax.  The Department responds that the buyers took possession in Wyoming; therefore, sales tax is due.  The SBOE agreed with the Department, and the record supports the SBOE's decision.

[¶ 16]  Prior to January 1, 2008, and during the time at issue here, "sale" was defined as "any transfer of title or possession in this state for consideration. . . ."  Wyo. Stat. Ann. § 39–15–101(a)(vii) (LexisNexis 2005).  After January 1, 2008, "sale" was defined as "any transfer of possession in this state for a consideration. . . ."  2006 Wyo. Sess. Laws, Chap. 10, § 1.  The issue in this case is whether transfer of possession or title took place in Wyoming or outside the state.  Sales tax is imposed on "[t]he sales price of every retail sale of tangible personal property within the state."  Wyo. Stat. Ann. § 39–15–103(a)(i)(A).  Sellers are required to collect and remit to the state the taxes imposed on sales of motorcycles and off-road vehicles.  Wyo. Stat. Ann. § 39–15–107(a)(i) and (b)(viii).

[¶ 17]  The Wyoming Sales and Use Tax Regulations in effect at the relevant time, provided as follows:

(q) Interstate Sales.

(i) The point at which title or possession of tangible personal property passes to the purchaser shall determine the location of the sale.  Tangible personal property shipped by the vendor at the time of sale and not used in Wyoming, to an out of state location may be considered a destination sale and not subject to the sales tax.

. . . .

(iii) Contracts of sale, sales invoices, bills of lading or other documentary evidence of the passage of title or delivery of tangible personal property to the purchaser inside or outside this state shall be

---

1.  Amended, in other parts, by 2011 Wyo. Laws, Ch. 127 (H.B.254).

retained by the vendor to establish the nature of the sale. If no such evidence is present, it shall be presumed that the sale occurred within the state and the vendor shall be liable for the sales tax thereon. Wyoming Sales and Use Tax Regulations, Ch. 2, Sec. 15 (2004).

[¶ 18] Maverick argues that these were nontaxable destination sales because neither title nor possession was transferred in Wyoming. Maverick contends that the sale documents show that the parties intended for change of possession to happen in the buyer's home state and the buyer had only constructive possession until the vehicle actually arrived at the buyer's residence either because delivery was made by a third party, a common carrier, or because the customer was acting as his/her own delivery agent. Maverick's point is that because the parties intended this transfer would take place outside of Wyoming, the transfer of "actual possession" did not happen in Wyoming, and the transfer of the title to the vehicles also occurred outside Wyoming when the mailed title documents were received by the buyer.

[¶ 19] The first assertion Maverick makes is that the invoices reflect the intent of both parties and they intended for transfer to occur in the buyer's home state. Maverick relies on *Hercules Powder Co. v. State Bd. of Equalization,* 66 Wyo. 268, 208 P.2d 1096, *reh'g denied,* 66 Wyo. 268, 210 P.2d 824 (Wyo.1949). As explained in *Buehner Block Co., Inc. v. Wyo. Dep't of Revenue,* 2006 WY 90, ¶ 23, 139 P.3d 1150, 1158–1159 (Wyo. 2006), "Hercules Powder was a Delaware corporation, with offices in Salt Lake City, Utah, and Denver, Colorado, and little or no physical presence in Wyoming." *Id., Hercules,* 208 P.2d at 1097. Hercules was engaged in the manufacture and sales of "explosives and incidental materials" and "sometimes took mail orders, from inside or outside Wyoming, for its products to be delivered to destination points within Wyoming." *Id., Hercules,* 208 P.2d at 1097–1100. "This Court concluded [in *Hercules* ] that the sales at issue in that case were not subject to Wyoming sales tax statutes because the straight bills of lading under which the goods were shipped acted to transfer title to the

goods to the consignees immediately upon shipment thereunder." *Buehner,* ¶ 23, 139 P.3d at 1159. The Court also relied upon the agency's own prior interpretation of the statutes as an alternative ground for decision. *Hercules,* 208 P.2d at 1110–12. The SBOE in this case properly interpreted *Hercules* as stating that the general rule that title passes at the point of shipment controls unless the circumstances clearly demonstrate a contrary intent.

[¶ 20] The principles enunciated in *Hercules* are reflected in the Wyoming Uniform Commercial Code, Wyo. Stat. Ann. § 34.1–2–401. The SBOE relied upon the U.C.C. to determine that title passed to the buyer when the vehicle was physically delivered to the buyer or the buyer's agent. Wyo. Stat. Ann. § 34.1–2–401 provides in pertinent part:

(a) Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

. . . .

(ii) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

(A) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(B) If the contract requires delivery at destination, title passes on tender there.

[¶ 21] Maverick first argues that it was improper for the SBOE to rely on the Wyoming U.C.C. statute because the comment to this section precludes reliance on the U.C.C. for regulatory purposes. Maverick then argues that if this statute is considered, it supports Maverick's argument because there was an explicit agreement that title would pass upon tender at the final destination. The comment to this section of the U.C.C. provides:

> 1. This Article deals with the issues between seller and buyer in terms of step by step performance or non-performance under the contract for sale and not in terms of whether or not "title" to the goods has passed. That the rules of this section in no way alter the rights of either the buyer, seller or third parties declared elsewhere in the Article is made clear by the preamble of this section. This section, however, in no way intends to indicate which line of interpretation should be followed in cases where the applicability of "public" regulation depends upon a "sale" or upon location of "title" without further definition. The basic policy of this Article that known purpose and reason should govern interpretation cannot extend beyond the scope of its own provisions. It is therefore necessary to state what a "sale" is and when title passes under this Article in case the courts deem any public regulation to incorporate the defined term of the "private" law.

[¶ 22] The question of whether it is appropriate to consider the U.C.C. when determining questions of tax regulation has not been directly addressed in Wyoming. We now find that it was appropriate for the SBOE to rely on the U.C.C. as an objective test to determine when title passed. As noted by the district court, there is some historical basis for this. The opinion in *Hercules* relied, in part, on provisions of the Uniform Sales Act, which was the predecessor to the U.C.C. *Hercules,* 208 P.2d at 1103. *See also,* Wyo. Stat. Ann. § 34.1–1–102 (recognizing the Uniform Sales Act as one of the prior statutory schemes incorporated by the U.C.C.). Other jurisdictions have relied on the U.C.C. for assistance in resolving tax questions. A typical analysis is that of the Rhode Island Supreme Court:

> While we have some doubts whether the regulations make reference to the Code as that body of contract law which should apply when applicable, we can perceive no reason why, when a question arises under the regulations as to contract interpretation, we should not employ the Code as our frame of reference. In doing so, we adhere to the current realities of the marketplace and will, therefore, be better able to gauge the parties' intent in those instances where intent is decisive under the regulations.

*Rice Machinery, Inc. v. Norberg,* 120 R.I. 542, 391 A.2d 66, 72 (1978).

[¶ 23] Other jurisdictions applying the U.C.C. to resolve tax issues include: *O'Brien v. Isaacs,* 32 Ill.2d 105, 203 N.E.2d 890, 891 (1965); *Continental Illinois Leasing Corp. v. Dep't of Revenue of State of Ill.,* 108 Ill. App.3d 583, 64 Ill.Dec. 189, 439 N.E.2d 118, 121 (1982) ("To determine when, for taxation purposes, ownership of or title to property is transferred, Illinois courts have applied the title passing tests of the Uniform Commercial Code."); *H.O. Anderson, Inc. v. Rose,* 177 W.Va. 419, 352 S.E.2d 541, 548 (1986) ("We find the provisions of the Uniform Commercial Code (U.C.C.) instructive in determining the passage of title in tax cases...."); *New England Yacht Sales, Inc. v. Comm'r of Revenue Servs.,* 198 Conn. 624, 504 A.2d 506, 509–510 (1986); *Circuit City Stores, Inc. v. Comm'r of Revenue,* 439 Mass. 629, 790 N.E.2d 636, 640 (2003) ("Our tax statutes provide no explicit definition of the term 'title,' and so we look for guidance to the Uniform Commercial Code ..."). *See also Crown Iron Works Co. v. Comm'r of Taxation,* 298 Minn. 213, 214 N.W.2d 462 (1974); *City of Richmond v. Petroleum Marketers, Inc.,* 221 Va. 372, 269 S.E.2d 389, 390 (1980); *Franklin Fibre–Lamitex Corp. v. Director of Revenue,* 505 A.2d 1296, 1299 (Del.Super.Ct.1985).

[¶ 24] Maverick then asserts that even if the SBOE could use the U.C.C., the SBOE decision was still wrong because the parties had an express agreement that title would pass when the vehicle reached the buyer's home state. The SBOE found that

the sale documents did not determine the point of transfer. We agree. The statement on the invoices, "delivered out of state," is not sufficient to overcome the fact that actual possession was transferred in Wyoming at the time of pick-up. The parties could have but did not use other language in the invoice to suggest that the transfer of possession would occur in another location, such as clauses dealing with risk of loss or responsibility for selection of carriers; this wording was missing from the invoices. In addition, the reverse side of the invoices contained the following paragraph:

> We are not liable for failure to deliver or delay in delivery of the purchased vehicle. If the failure or delay is due, in whole or part, to any cause beyond our control or without our fault or negligence, we are not liable to you for any consequential damages, damages to property, damage or loss of use, loss of time, loss of profits or income, or any other incidental damages arising out of the sale or use of the purchased vehicle.

An objective analysis indicates that transfer of possession occurred in Wyoming. The record supports the SBOE's findings.

[¶ 25] Maverick contends that title was transferred to the buyer when the certificate of title or the manufacturer's statement of origin (MSO) was mailed to the buyer or the buyer's lender some weeks after the sale. Maverick uses the term "title" to mean the written documents that prove ownership. Wyoming has long recognized that "title" has a broader definition. *Brown v. Wintermute*, 59 Wyo. 254, 139 P.2d 435, 438 (1943) (" 'A party may have a title to property although he is not the absolute owner.' ") (quoting *Roberts v. Wentworth*, 59 Mass. 192, 5 Cush. 192 (Mass.1849)). The statute uses the term "title" in a more general sense, and the statutory use of the term "title" means " '[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property.' " *McAlpine v. Zangara Dodge, Inc.*, 144 N.M. 90, 183 P.3d 975, 977–978 (Ct.App.2008) (quoting *Black's Law Dictionary* 1522 (8th ed. 2004)). "Title" to a vehicle may be transferred, or passed, even though there is a failure to comply with code provisions concerning the certificate of title. *State v. Montano*, 93 N.M. 436, 601 P.2d 69, 74 (Ct.App.1979). The question is not when the buyer received his paperwork, but when he became the owner of the vehicle.

[¶ 26] A majority of the transactions at issue involved out-of-state buyers who would come to either the Cheyenne or Laramie store, pick up the vehicle, and return to their home state. Maverick argues that those customers who picked up their vehicles were acting as their own agent and only had constructive possession for delivery purposes; therefore, possession did not transfer from the seller to the buyer until the buyer arrived home. Maverick relies almost entirely on *State ex rel. Wyo. Dep't of Revenue v. Union Pacific R.R. Co.*, 2003 WY 54, 67 P.3d 1176 (Wyo.2003), to support the interesting argument that a person can be his own agent and have only constructive possession of an item that he controls. Reliance on the *Union Pacific* case in this instance is misplaced.

[¶ 27] *Union Pacific* involved a case where the Department assessed tax on ballast used by the Union Pacific (UP). Some of the ballast was used by the UP in Wyoming and some was used in other states, but it was delivered to the UP for transportation to the out-of-state construction sites. The ballast used out of state was subject to inspection in the state to which it was delivered. The SBOE found that tax was due on the ballast used in Wyoming (the "maintenance ballast") but not on the ballast used outside the state (the "construction ballast"). We affirmed, finding that the UP obtained complete control of the maintenance ballast because it was accepted without reservation. However, the construction ballast was transferred as a non-taxable destination sale because the purchaser retained the right to reject it, in which case, the ballast was returned at the seller's expense. *Union Pacific*, ¶¶ 14–15, 67 P.3d at 1183. We also specifically noted that the UP was the agent for the vendor. *Id.* There is nothing in the opinion to suggest that this Court found that the UP was acting as its own agent.

[¶ 28] The contention that a person can act as his own agent presents several

practical problems and is contrary to established law. A relationship of agency is established when two parties agree that one, the agent, shall act on behalf of and subject to the control of the other, the principal. The first section of the Restatement of Agency Law explains that an agent and a principal are different persons. Restatement (Third) of Agency Law § 1.01 (2006) states that " 'Agency' is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." This contemplates different entities for agent and principal. *Franks v. Independent Prod. Co., Inc.,* 2004 WY 97, ¶ 11, 96 P.3d 484, 490 (Wyo.2004) (" 'Agency is a fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent.' ") (quoting *True v. Hi–Plains Elevator Machinery, Inc.,* 577 P.2d 991, 999 (Wyo.1978)).

[¶ 29] Furthermore, there is no logic to the assertion that a person in actual control of an object has only "constructive possession." This term has often been used in the context of criminal cases and has a well-defined meaning: "A person who, *although not in actual possession,* knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person, is in constructive possession of it." *Dettloff v. State,* 2007 WY 29, ¶ 31, 152 P.3d 376, 384 (Wyo.2007) (emphasis added). This definition is just as appropriate here. We do not accept the argument that a person may act as his or her own agent, and we hold that a customer who picked up a vehicle in Wyoming had actual possession at the time of pick-up. *2 Hellerstein & Hellerstein* ¶ 18.02(2)(e), 18–14 (2010). The sale therefore occurred in Wyoming and was properly taxed.

[¶ 30] The remaining transactions are those where delivery was made by a third-party carrier. The evidence was that Maverick might recommend a carrier; how-

ever, the customer ultimately chooses the carrier, and the contract is between the carrier and the customer. Under these facts, the carrier would be the agent of the buyer; and when possession was transferred to the carrier in Wyoming, sales tax was due. *2 Hellerstein & Hellerstein* ¶ 18.01(2)(b), 18–9 (2010).

[¶ 31] A review of the record indicates that substantial evidence supports the SBOE's finding that transfer of possession and title of these vehicles occurred in Wyoming, and the levy of a sales tax on these transactions is appropriate.

**2. Was collection of sales tax by Wyoming unconstitutional?**

[¶ 32] Maverick argues that collection of a sales tax on these vehicle transactions violates the Commerce Clause, Art. 1, § 8, of the United States Constitution. First, Maverick asserts that a Wyoming tax discriminates against or unduly burdens interstate commerce; and, second, unless Maverick is allowed a credit for sales or use taxes paid in other states, there is an unconstitutional multiple taxation of a single transaction.

[¶ 33] The Commerce Clause gives Congress the power to regulate commerce among the several states. The framers of the Constitution intended to encourage free trade among the several states, to minimize restriction of the flow of commerce among the states, to protect commercial interactions from odious restraint, and to preclude interference through inconsistent or hostile state laws. *Oregon Waste Systems, Inc. v. Dep't of Envtl. Quality of State of Or.,* 511 U.S. 93, 98–99, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). The framers also intended to prohibit one state from exacting more than its just share of revenue from interstate commerce than would be proportionate with the burden imposed within that state by the commercial action. *Id.*

[¶ 34] "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state eco-

nomic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337–338, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008). "[(T)he] very purpose of the Commerce Clause was to create an area of free trade among the several States." *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977) (quoting *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944)). The Commerce Clause not only authorized Congress to enact laws to protect and encourage commerce among the States, but it also created "'an area of trade free from interference by the States.... (T)he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States.'" *Id.* (quoting *Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 91 L.Ed. 265 (1946)). A state may not tax interstate transactions more heavily than intrastate transactions. *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992). "Once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry." *Id.*

[¶ 35] In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), the U.S. Supreme Court imposed a test to aid courts in deciding this question of possible discrimination. *Complete Auto* involved a carrier which transported automobiles manufactured outside the state of Mississippi to dealers in that state. The carrier sought a refund of a sales tax imposed by Mississippi on those deliveries. The Court noted that the purpose of the Commerce Clause was not to relieve those engaged in interstate commerce of their just share of the state tax burden. *Complete Auto*, 430 U.S. at 279, 97 S.Ct. at 1079. The Court upheld the Mississippi tax using what has now become known as the "*Complete Auto* four-prong test." The test is used to determine whether a state tax violates the Commerce Clause, and it overruled the previously more formal and ritualistic view. Instead, the Court, referencing the more pragmatic approach, noted:

These decisions have considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.

*Id.*

[¶ 36] In *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995), the U.S. Supreme Court held that a state had the power to impose a tax on the unapportioned gross receipts from the sales of bus tickets purchased in Oklahoma for trips with an out-of-state destination. The issue was whether the tax should be apportioned because the trip passed through other states. The Court applied the four-pronged *Complete Auto* test. *Id.* at 183, 115 S.Ct. at 1337. The Court held that apportionment was not necessary. The Court found that there was no possibility of duplicate taxation by other jurisdictions that would levy the same type of tax since the Oklahoma tax was only imposed on sales made in that state; therefore, the tax had internal consistency. *Id.* at 185, 115 S.Ct. at 1338. The Court also examined external consistency, which "looks not to the logical consequences ... but to the economic justification ... to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to the economic activity within the taxing State." *Id.* The Court indicated that although some state taxes must be apportioned in order to satisfy the Commerce Clause, this apportionment is not required in cases involving sales taxes. *Id.* at 186–88, 115 S.Ct. at 1338–40. A sale subject to sales tax is a discrete transaction, and the Court had consistently approved taxation of sales, without any allocation between the states. *Id.* at 186–87, 115 S.Ct. at 1339. As to the final two prongs of the test, the Court held that a tax was not discriminatory unless it provided a direct "commercial advantage" to local businesses. *Id.* at 197, 115 S.Ct. at 1344. The Oklahoma tax passed muster because it was levied on both interstate and intrastate sales. *Id.* at 199, 115

S.Ct. at 1345. The last factor requires a "fair relation" between the tax and the benefits conferred by the state. The Court ruled that the state was not required to provide a "detailed accounting" and that interstate commerce could be required to pay its share and to contribute to the cost of government. *Id.*

[¶ 37] When the *Complete Auto* analysis is applied to this case, the tax imposed on Maverick sales meets constitutional requirements. The sale in Wyoming is a discrete event; and under *Jefferson,* the sales tax is appropriate regardless of any subsequent out-of-state use. Since it is a sales tax imposed on a single discrete transaction, apportionment is not required. There is no discrimination; the tax is imposed equally on resident and nonresident buyers. Finally, the relationship between the tax and governmental services, as noted, does not require a detailed comparison of the tax relative to the public services provided. It is sufficient that the event is taxable and, therefore, the taxes may be used for services even if they are not related to the taxable event.

[¶ 38] Maverick argues that if Maverick is not given a credit for use taxes paid in other states, then multiple taxes are imposed on a single transaction, contrary to constitutional principles. The parties stipulated, prior to the hearing before the SBOE, that Maverick was not required to prove that its customers had paid a sales or use tax in their home states because the Department was not contesting the payment of this tax. The Department indicated that it had entered into this stipulation because the only issue was whether the tax was due in Wyoming; therefore, payment of taxes in other states was not relevant. Maverick asserts that Wyoming should recognize that sales or use taxes may have been paid in the purchaser's home state, and that collection of the tax by Wyoming violates the holding of *Jefferson.*

[¶ 39] Maverick falls short with its argument that it is entitled to a credit for taxes paid in other states. Maverick fails to recognize that this is not an issue of an imposition of a tax; rather, the issue is a question of whether a sales tax, properly imposed, may be enforced and collected. Maverick had the obligation to collect the tax at the time of the sale. It did not do so, relying solely on statements from the previous owner that were contrary to law. Maverick officials conceded that they did no independent investigation or otherwise attempt to determine their tax obligations. As a result, the sales taxes were not collected because Maverick incorrectly believed that they were not due. This is not a basis for allowing Maverick any tax credit for taxes subsequently paid in other states.

[¶ 40] The District of Columbia and 44 of the 45 states that levy sales and use taxes allow a credit or exemption for similar taxes paid other states. *Jefferson,* 514 U.S. at 194, 115 S.Ct. at 1343, *2 Hellerstein & Hellerstein,* ¶ 18.08, 18–100 (2010). However, as explained in *Jefferson,* these credit provisions create a national system under which the first state of purchase imposes the tax. *Id.* Wyoming is the first state of purchase, so it is entitled to impose the tax, and other states should allow a credit for the Wyoming tax. Maverick had a statutory obligation to collect the sales tax; and if it had done so, there would be a strong argument that the buyer's home state would be required to grant a credit for the sales tax. To the extent that it may prove difficult or even impossible for Maverick to obtain the credit from these other states or from its customers, these difficulties are solely the result of its own actions.

[¶ 41] We affirm the actions of the SBOE in determining that the purchase of the various recreational vehicles at issue in this case constitutes a taxable event in Wyoming. We also agree with the SBOE that collection of sales taxes on these vehicles does not violate the U.S. Constitution, Art. 1, § 8, (the Commerce Clause).