MILES HOMES OF INDIANA, INC. (Miles Homes Division of Insilco Corporation), Appellant (Defendant, Counter-Claimant and Cross-Claimant Below),

v.

HARRAH PLUMBING AND HEATING SERVICE CO., INC., Appellee (Plaintiff, Counter-Defendants Below),

John W. Lee and Margaret Lee, Appellees (Defendants, Cross-Defendants Below).

John W. LEE and Margaret Lee, Appellants (Defendants, Cross-Defendants Below),

v.

HARRAH PLUMBING AND HEATING SERVICE CO., INC., Appellee (Plaintiff Below),

Miles Homes of Indiana, Inc. (Miles Homes Division of Insilco Corporation), Appellee (Defendants, Counter-Claimant and Cross-Claimant Below).

No. 1–879A219.

Court of Appeals of Indiana, First District.

Aug. 14, 1980.

Cox, Zwerner, Gambill & Sullivan, Terre Haute, for appellant.

Brames Bopp & Haynes, Terre Haute, Pedro S. Martinez, Jr., Indianapolis, for appellees.

ROBERTSON, Presiding Judge.

This is an appeal by Miles Homes of Indiana, Inc. (Miles Homes) from a judgment foreclosing the mechanic's lien of Harrah Plumbing and Heating Service Co., Inc. (Harrah) on real property to which Miles Homes holds title and in which John W. and Margaret Lee (Lees) hold an interest as conditional land contract purchasers.

We reverse and remand.

Miles Homes provided materials to build a "shell house", (i. e., a house without electricity, plumbing and interior finishing) to the Lees. Miles Homes took a mortgage on the real estate upon which the house was built as security for the note executed by the Lees for the materials. The amount of the note was $7,814.00. This was on August 13, 1971. The Lees fell behind in their payments and the Lees, in exchange for the cancellation of the note held by Miles Homes, conveyed the property to Miles Homes by warranty deed on April 12, 1974. The amount of consideration stated in the deed was the amount then owed—$8,779.93. The deed contained the term: "It is the intention of the grantee that the interest conveyed herein will remain separate and distinct from the separate mortgagee's interest previously acquired." At the same time, an installment or conditional land contract was entered into whereby Miles Homes agreed to sell the real estate for $8,300.00 at the rate of $78.69 a month until March 15, 1975, when the remaining unpaid balance would be due. The Miles Homes official testified the contract was entered into to give Lees time to refinance or find another mortgage.

The contract contained a term that no improvements could be made upon the property without written agreement of the vendor. However, on cross-examination, an official from Miles Homes admitted that the Lees were free to, and expected to, make such improvements as to make the house modern and habitable. The Lees did not make payments on time and were in possession at trial. The Lees made 16 payments after the contract was to be paid off in full. On August 5, 1975, a contract was entered into between the Lees whereby

Harrah would provide plumbing for the house at a cost of $3,600. The work was completed, as found by the trial court, on or about July 20, 1976, at a slightly higher cost because of extras. The contract price was not paid and Harrah filed a mechanic's lien, giving notice to the Lees and Miles Homes. Miles Homes brought an action within the same suit against the Lees for forfeiture of the conditional land sale contract or in the alternative for foreclosure of its alleged unmerged mortgage.

The trial court, without intervention of a jury, found that the mechanic's lien was properly perfected, that Harrah had priority over any claim of Miles Homes and that the real estate should be sold in foreclosure with the claims of Harrah paid first, then the Miles claim with the Lees to receive any excess.

Miles Homes and the Lees appealed. The Lees' appeal was dismissed for various deficiencies on the motion of Miles Homes. Miles Homes has presented a plethora of errors on appeal; however, because of our decision we need address only two groupings of them. The first is whether Miles Homes has priority over Harrah based on its alleged first mortgage; and second, whether it is possible for Harrah to acquire a mechanic's lien against the interest of Miles Homes based on a contract entered into with the contract purchasers, the Lees.

■ We first discuss whether the mortgage of Miles Homes remained unmerged when it took title to the property. We note that Miles Homes expressly intended to keep the mortgage alive, however:

> if the conveyance is made and accepted as payment of the mortgage debt no question of merger is possible. The debt is discharged by payment, or perhaps more accurately, by substituted performance or accord and satisfaction; but not by merger. The creditor now has full title to the property with no debt in existence for it to secure. If the mortgage debt is extinguished, the mortgage itself is never kept alive. Consequently, there is automatic merger of the two interests in the property and no intent on the part of the credi-

tor can keep them separate. [Citations omitted.]

*G. Osborne, Handbook on the Law of Mortgages,* § 274, (2d Ed. 1970).

There is authority for the proposition that the lien will be revived so as to prevent junior lienors from gaining a windfall priority by a merger. *Id.* § 275. In the situation at hand, if Harrah had attained its lien after the Miles Homes mortgage, but before the transfer of deed in lieu of foreclosure, to allow Harrah priority over Miles Homes would be a windfall, since Miles Homes could have obtained foreclosure and, assuming its debt equalled the value of the real estate, cut off any junior lien of Harrah's. The cases cited by Miles Homes follow this pattern.

■ However, to allow Miles Homes to "revive" the mortgage in the situation at hand would be equally a windfall for Miles Homes. There is no intervening lienor here, rather there is a lienor subsequent to taking title. Thus, the same consideration of "windfall priority" is not a factor here, and we reject any "revival" here.

As to the second general category of error alleged, the trial court made two findings concerning the part Miles Homes took in the plumbing contract. Finding number three states that Harrah furnished work, labor and materials at the special instance and request of the Lees "with the full knowledge and consent of Miles Homes. . . ." Finding number thirteen states that Miles Homes only implicitly knew, consented and authorized any work and furnishing of materials to the house.

Our examination of the record shows that the second finding is undoubtedly the one shown by the evidence. There was no testimony of actual knowledge, authorization or consent by Miles Homes, but rather there was implicit consent, knowledge and authorization based on the fact that Miles Homes was aware the house was incomplete and that work and materials would have to be provided by someone to finish the house. We, thus, reject finding number three as clearly erroneous and accept the latter finding.

■ We turn to the law on the subject. A long line of cases in Indiana has held that in order 'for a mechanic's lien to attach to the titleholder's interest for materials used in and on the real estate and its improvements, it is necessary that such material be furnished by the authority and direction of the titleholder, and something more than inactive consent on the part of such owner is necessary in order that a lien be acquired against him. *Woods v. Deckelbaum*, (1963) 244 Ind. 260, 191 N.E.2d 101; *The Dallas Co., Inc. v. William Tobias Studio, Inc.*, (1974) 162 Ind.App. 215, 318 N.E.2d 568 (and cases cited therein.)

■ As noted by *Potter v. Cline*, (1974) 161 Ind.App. 349, 316 N.E.2d 422, there is "loose and imprecise language" existing in the long line of cases that suggest that the mechanic cannot place a lien on *any* interest of the real estate when the conditional vendee or lessee enters in the contract without active consent of the titleowner. Such a view is incorrect, it is only the *titleowner's interest* that cannot be reached; the interest of the lessee or, as here, conditional vendee can be so reached.

The statute and the cases clearly show that the interest of a contract purchaser or conditional vendee is subject to a lienable interest. *Potter, supra; Kendall Lumber & Coal Co., Inc. v. Roman*, (1950) 120 Ind.App. 368, 375, 91 N.E.2d 187, 190; *Ind.Code* 32–8–3–2 ("The entire land upon which any such . . . improvement is situated . . . shall be subject to lien to the extent, of all the right, title and interest owned herein by the owner thereof . . .") *See Mid America Homes, Inc. v. Horn*, (1979) Ind., 396 N.E.2d 879 (analysis of term "owner"). Thus, in the case at hand, although Harrah does not have a possible lien against Miles Homes, it does against the Lees, on their interest as contract purchasers.

We must now consider, however, the effect of the third-party action by Miles Homes against the Lees on the possible mechanic's lien of Harrah on the Lees' interest. Miles Homes, because of the default of the Lees on the contract, prayed for forfeiture of the contract, or in the alternative, foreclosure of their "first" mortgage. We have already determined that Miles Homes has no mortgage interest here, as there is no debt owed. In examining the record, we can find no reason why the Lees' interest cannot be forfeited under the rule of *Skendzel v. Marshall*, (1973) 261 Ind. 226, 301 N.E.2d 641, which examines whether a forfeiture would act as a penalty. Here, the Lees have paid no principal towards the contract, and owed more at the time of trial than they did when the contract began. They presented no evidence at trial that they have any equity in the house.

■ Miles Homes was entitled, then, to a forfeiture of the installment land sale contract and we must examine the effect of such a forfeiture on the possible lien of Harrah's on the Lees' interest. The slim authority we can find states that the lien is extinguished with the forfeiture.

A Michigan case that is factually similar to the one at hand states:

Here Eastern contracted with the Coles for the home improvements. At the time the work commenced, the Coles were land contract vendees and as such did not have title to the premises. Thus pursuant to the statute arrayed above, Eastern's mechanic's lien did not attach to the title but rather only to the Coles' land contract interest in the property. Therefore inasmuch as Eastern could have no greater interest in the property than the parties with whom it contracted, it follows that when the Coles defaulted on the land contract and the contract was forfeited, the Coles' interest in the property and likewise Eastern's lien which was based upon the Coles' interest were extinguished. Consequently Eastern did not have a lien interest on which to foreclose.

*Eastern Construction Co. v. Cole*, (1974) 52 Mich.App. 346, 351–52, 217 N.W.2d 108, 111; *See also O'Hara Plumbing Co., Inc. v. Roschynialski*, (1973) 190 Neb. 246, 207 N.W.2d 380; 53 *Am.Jur.*2d, Mechanic Liens, § 129 (1970).

It is true that it was not until Harrah filed its mechanic's lien and the suit on foreclosure of its lien commenced, that Miles Homes instituted its claim for default and forfeiture. While we are not in sympathy with such new-found concern for the time-of-the-essence term, we note that no affirmative defense of waiver was raised by the Lees. We further note that being in derogation of the common law, the mechanic's lien statutes relating to the creation, existence or persons entitled to the lien are strictly construed. *Mid-American Homes, supra.* We also note that the legislature has spoken to the problem and given its partial cure in IC 32–8–3–2:

> and where the owner has only a leasehold interest, or the land is encumbered by mortgage, the lien, so far as concerns the *buildings erected* by said lienholder, is not impaired by forfeiture of the lease for rent or foreclosure of mortgage; but the same may be sold to satisfy the lien and be removed within ninety [90] days after the sale by the purchaser. [Emphasis added.]

We cannot interpret this section to encompass Harrah, who did not erect a building and where the statute does not speak to contract purchaser's interests.

As the trial characterized it, we also are not impressed by Miles Homes's "legal tinker toy game" here; however, it is a legislative decision just how to protect the interests of a mechanic in this situation.

Judgment reversed, and remanded with instructions to enter judgment not inconsistent with this opinion.

NEAL, J., concurs.

YOUNG, J., (sitting by designation) dissents with opinion.

YOUNG, Judge, dissenting.

I dissent.

Whether Miles consented to the work, labor and materials of Harrah being furnished to the Lee "shell" house so as to subject Miles' interest in the real estate to a mechanic's lien is a factual issue that has been determined by the trial court in favor of Harrah. I would not disturb that finding on appeal. A mechanic's lien may not attach to a titleholder's interest unless materials are furnished at the authority and direction of the titleholder and something more than inactive consent on the part of the owner is necessary in order that a lien may be acquired against the owner. *Better Homes Co. v. Hildebrand Hardware Co.,* (1929) 202 Ind. 6, 171 N.E. 321.

The rule itself is somewhat anomalous. It initially seems to require, as a precondition to the valid attachment of a mechanic's lien, the express authority and direction of the titleholder, but then modifies that rigidity by permitting consent by the titleholder to obviate the initial requirement. Indeed, in *Better Homes* itself, the Court found the requisite "active and instrumental" conduct on the part of the titleholder to permit a mechanic's lien to attach even though the work was not performed at the express direction or authority of the titleholder.

Later cases indicate "active and instrumental" conduct by the titleholder is tantamount to "authority and direction." Here, Miles' conduct in anticipating the plumbing would be installed, its knowledge that the contract purchaser might become obligated to materialmen and laborers, its sale of a shell house which without plumbing, heat or electricity would not be habitable, the importance it attached to the house's completion in order to increase its security, all indicate active and instrumental conduct sufficient to allow the lien to attach. *American Islam Society v. Bob Ulrich Decorating,* (1956) 126 Ind.App. 266, 132 N.E.2d 620, 622. All of this was found as fact by the trial court and the majority should not re-examine the evidence to conclude otherwise. The finding of the trial court that the plumbing work was done with "full knowledge and consent" of Miles, and that it "impliedly authorized" the contract purchaser to finish construction on the residence, and that Miles "impliedly authorized" and knew there would be materials, supplies and labor performed on the real estate by persons other than the Lees is amply supported by the evidence.

Leo Flynn, Miles' field representative and manager of its property department and the manager of its hard core collection department testified, in part, as follows:

COURT: What exactly did Miles Homes at this time send to the purchaser in the form of materials? The original purchase price—or mortgage note—was $7814. The $7814—what does that include?

WITNESS: It includes all the rough—for example, your Honor, it includes the 2 × 4's, 2 × 6's, 2 × 8's, 2 × 10's; the outside wall sheeting, the siding; the roof boards; the shingles; the windows; ten feet of cabinets; the rough structure of the home. It does not include any of the—what is called packages—electric or the plumbing or the heating is not included in that fee, your Honor.

COURT: The plumbing isn't included?

WITNESS: No, sir, it is not.

COURT: Yet when you instituted this, you took a mortgage and a note, am I correct?

WITNESS: Yes, sir.

COURT: Was it anticipated that the person buying from you would buy from other people other materials that were not sent as a part of the package?

WITNESS: It is the discretion of the buyer, your Honor, that he could buy materials from Miles Homes if he so desired.

COURT: All right. But that's in his discretion?

WITNESS: Yes, sir.

COURT: So that you could contemplate that a buyer of a Miles home might become obligated to electricians, possibly, or plumbers, or lumber companies?

WITNESS: I don't know how to answer the question, your Honor. The material is furnished by Miles under an initial contract for the shelling-in of the home, as it's called. The extra material can be purchased from Miles and installed by the customer at his own pace or his own will or his own discretion.

COURT: All right. But you didn't consider it a complete wasting of the mortgage property if they ordered from an outside source—such as the plumbing—did you?

WITNESS: I don't think I understand the question, your Honor.

COURT: All right. Did you consider it a default of the mortgage note and contract with relation to the property if your buyer purchased the things that he needed to finish the house?

WITNESS: No, sir. He could buy whatever he wanted wherever he wanted to buy it at his own discretion.

COURT: Well, he had to, didn't he, to complete the house?

WITNESS: He could have ordered from Miles, your Honor.

COURT: But he had to get other things to complete the house?

WITNESS: Yes, sir.

COURT: And it was his discretion whether he bought it from you or bought it from Powell-Stephenson Lumber Company, which is a local lumber company?

WITNESS: That's right, sir.

COURT: Or from Harrah Plumbing?

WITNESS: That is correct, your Honor.

COURT: You anticipate he had to have plumbing in there?

WITNESS: Yes, sir.

COURT: And he could either do it himself or he could hire it done?

WITNESS: The understanding was that the customer would do it on his own, sir.

COURT: Well, by "his own" you mean hire it done or do it himself?

WITNESS: Well, I guess what I'm trying to say, your Honor, is that he had the right to do the work however he deemed necessary.

COURT: Okay. But it was important to Miles Homes that the home be completed?

WITNESS: Yes, sir.

COURT: That increased your security, did it not?

WITNESS: Yes, sir.

COURT: To sit without plumbing certainly wouldn't make your security or your salability or resalability of your house that is mortgaged any better?

WITNESS: No, sir.

COURT: So then in the Lee's case here, did you know he was putting plumbing in that house?

WITNESS: I personally did not have knowledge that he was—quote, unquote—putting plumbing in the house, no, sir, but as a normal situation you would anticipate that he would be.

It is evident from the testimony that

(1) Miles anticipated that other materials would be bought by the Lees;

(2) A buyer of a Miles home might become obligated to electricians, plumbers or lumber companies;

(3) Miles did not consider it a default of its mortgage note and contract if the buyer bought things necessary to finish the house;

(4) The buyer would install plumbing;

(5) It was important to Miles that the house be completed in order to increase its security;

(6) To sit without plumbing would not make their security or the salability of the home any better;

(7) In a normal situation Miles anticipated that plumbing would be installed.

The trial court's factual determination is well taken and the legal conclusion that Miles gave authority and direction follows.

I would affirm the trial court.