2012 WY 24

**REDCO CONSTRUCTION, a Wyoming Corporation, Appellant (Plaintiff),**

v.

**PROFILE PROPERTIES, LLC, a Wyoming LLC, Appellee (Defendant).**

No. S–10–0255.

Supreme Court of Wyoming.

Feb. 23, 2012.

Representing Appellant: Justin Kallal of Justin Kallal, PC, Jackson, Wyoming.

Representing Appellee: Raymond W. Martin of Sundahl, Powers, Kapp & Martin, LLC, Cheyenne, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] This case is a lien foreclosure case involving a landlord, a tenant and a contractor. Profile Properties, LLC (Profile) leased commercial real property to Clean Start, LLC (Clean Start). Clean Start sought to renovate the property to convert it from office space to a commercial laundry facility. Profile granted Clean Start permission to renovate the property on the condition that Clean Start would pay for the renovations, and Clean Start thereafter contracted with Redco Construction (Redco) to perform the work. When Clean Start defaulted on its payments to Redco, Redco filed a lien against Profile's property.

[¶ 2] Redco thereafter filed a complaint against Profile and Clean Start, alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, *quantum meruit*, unjust enrichment, and promissory estoppel, and seeking to foreclose on its lien against Profile's real property. The district court interpreted Wyoming's lien statutes to allow a lien against a landlord's real property for the debt of a tenant under two circumstances: 1) if the landlord agreed to pay for the improvements to the property; or 2) if the tenant was acting as the landlord's agent in contracting for the improvements. It then granted Profile's motion for summary judgment finding that Profile did not agree to pay for the renovations to the property and that Clean Start was not acting as Profile's agent in contracting for the improvements. We affirm.[1]

---

1. The district court also granted Profile summary judgment on Redco's *quantum meruit* claim against Profile. Redco did not raise that part of the ruling as an issue on appeal or otherwise present argument on the issue. We therefore will not address that part of the district court's decision in our discussion.

## ISSUE

[¶ 3] Redco presents the following single issue on appeal:

a. Did the trial court err as a matter of law by finding that for a valid mechanic's lien to exist for improvements placed upon the landlord's property by the tenant, "specifically authorized" as used in W.S. 29–2–105(a)(ii), requires the finding of something akin to an agency relationship between the landlord and tenant and granting summary judgment to the Defendant?

## FACTS

[¶ 4] Profile owns a commercial property in Cheyenne, Wyoming, that it historically leased as office and storage space. In January 2008, Profile began negotiations to lease that commercial space to Clean Start. From the outset of their negotiations, Profile understood that Clean Start desired to use the property as a commercial laundry facility and that it desired to eventually purchase the property. Both Profile and Clean Start also understood that converting the property from office space to a space that would accommodate a commercial laundry operation would require substantial renovations to the property, including an upgrade in the property's electrical supply.

[¶ 5] In January 2008, at the same time it was negotiating to lease Profile's property, Clean Start contacted Redco, a general contractor. At Clean Start's request, Redco examined the property to determine its suitability for a commercial laundry facility and advised Clean Start that the property could be renovated to accommodate a laundry operation. Clean Start thereafter sought and received Profile's permission to renovate the property.

[¶ 6] After receiving Profile's permission to renovate the property, Clean Start hired Redco to perform the work. Redco prepared the plans and specifications and obtained the necessary permits to complete the construction. Redco began work on the renovations in March 2008, approximately two months before Profile and Clean Start memorialized their agreement with the execution of a Lease Agreement (Lease).

[¶ 7] During the negotiations between Profile and Clean Start and their subsequent relationship, Scot Cook acted on behalf of Profile, and David Sipe acted on behalf of Clean Start. Scot Cook testified that on behalf of Profile, he authorized the renovations, and that he knew generally what those renovations would entail but no specifics. David Sipe testified similarly. Both Cook and Sipe further testified that Clean Start alone selected the contractor to perform the renovations, that no one from Profile reviewed or was shown the plans or specifications for the work, that Profile did not know the specific design details or costs of the renovations, that Profile did not assert any control over the renovations, that Clean Start was to pay the entire cost of the renovations, and that no one on behalf of Profile at any time met with Redco or its representatives to discuss the contract or the work being done to the property.

[¶ 8] With respect to control over the improvements and construction, Scot Cook testified more particularly:

Q. Acting on behalf of Profile, what was the extent that you had control over the construction work Clean Start was having performed on the building?

A. Profile did not have any control over the construction work. Profile had a lease agreement with David Sipe with an option to purchase, being a triple net lease, and all construction costs were borne by David Sipe.

Q. Could you have requested that Clean Start use specific contractors to perform work?

A. No.

* * * *

Q. Did Profile have any control over who Clean Start used as a general contractor on the job?

A. No.

Q. Did you ever object to Redco being used?

A. No.

* * * *

Q. Did Profile have the authority to tell Clean Start which modifications of the building it approved of and which ones it did not?

A. No. In regards to structural issues or what have you; is that what you're referring to?

Q. I was kind of—a general modification.

A. Under the lease terms with Clean Start, he has to conform to city codes.

Q. And I guess what I meant is if he wanted to put in 30 washing machines, that was okay?

A. Yeah. It's his business.

[¶ 9] David Sipe's testimony on the question of who controlled the details of the construction echoed that of Scot Cook. He testified:

Q. Did Scot Cook on behalf of Profile Properties ever make any of the construction decisions as to how that building was going to be remodeled?

A. No.

Q. Were those decisions exclusive to yourself?

A. Those—those decisions were a collaboration of me and Redco and Ted and outside parties as far as my equipment and things like that.

Q. But none of that was done at the behest of Profile Properties; is that fair?

A. That's fair.

[¶ 10] M.J. Gertsch is the Redco principal who worked with Clean Start on the renovations to the property. Gertsch testified that Redco's contract was with Clean Start and that Redco had no contract with Profile. Gertsch also testified that he knew Profile owned the building and property on which Redco was working, and Redco did not seek out or receive from Profile a guarantee that it would pay for the work if Clean Start was for any reason unable to pay Redco.

[¶ 11] Redco was not the sole contractor to perform work on the property renovations. Some demolition work was done by a contractor known as C.H. Yarber, a company in which Scot Cook has an ownership interest. Clean Start contracted with Yarber directly and paid it in full for the work that it did on the property. Cook testified that he did not recommend Yarber for the work, and that he had no involvement in negotiating the contract between Yarber and Clean Start or in overseeing Yarber's work on the project. On appeal, Redco does not contend otherwise.

[¶ 12] The other contractor to perform work on the property was an electrical contractor. In the course of their negotiations, Profile agreed to advance the funds necessary to complete the upgrade of the property's electrical service. Clean Start agreed to repay the cost of the electrical upgrade through higher rental payments for the first two years of the Lease. Scot Cook testified as follows concerning his involvement with the electrical contractor:

Q. ... And did you—were you the person who hired Superior Electric?

A. Yes.

Q. And did you—did you provide them with the scope of work?

A. As in behalf of Profile Properties?

Q. I just mean did you physically—I want to know who negotiated with them in case I need to talk to them. I want to know who gave them the plans.

A. David Sipe. David Sipe coordinated with Superior Electric for his needs of what he needed specifically for the building, and then Superior Electric coordinated with me in reference to cost. And then when I had the cost, I built it into the lease agreement, and that's how we derived the terms. But as—was I directing Superior Electric to say I need a 400–amp, three-phase, umpteen-gazillion circuit something or other? No.

[¶ 13] Profile and Clean Start formally executed a Lease Agreement (Lease) on May 29, 2008. It provided for an initial term of June 1, 2008, to May 30, 2012, and a purchase option that allowed Clean Start to purchase the property after April 1, 2012. Alternatively, the Lease provided Clean Start the option of extending the Lease for an additional term through May 30, 2015.

[¶ 14] The Lease was a triple net lease that required Clean Start as the tenant to pay all real estate taxes, building insurance, and maintenance expenses, in addition to its

monthly rental payment. The monthly rental payment was $8,200, which would drop to $6,000 at the end of the first two years. The additional $2,200 per month during the first two years was Clean Start's repayment of the amount Profile fronted for the electrical upgrade. The Lease did not require Clean Start to make improvements to the property, but it did allow Clean Start to make major alterations to the premises, provided Clean Start obtained Profile's prior permission.

[¶ 15] David Sipe and Scot Cook both testified that the parties negotiated the Lease with the intention and expectation that Clean Start would exercise its option to purchase the property. Cook testified:

> Q. And as construction progressed, you became aware in your capacity for Profile that substantial changes were being made to your building of returning [sic] it into a very specialized use building?
>
> A. We were under the assumption that David Sipe was going to execute his option to purchase, and he had intended and he had expressed the entire time that he was going to be purchasing the facility.
>
> Q. Right. But to answer my question directly, you were aware that your building was becoming very specialized, yes or no?
>
> A. We were under the understanding that the building was going to be used for a commercial laundry on behalf of David Sipe, and we were also under the impression that he was executing his option to purchase on the 12th of 2012. Thus—
>
> Q. Is that a yes?
>
> A. I was under the impression, yes—no, I was under the impression that they were making the modifications for a commercial laundry. Was it highly specialized? I mean, it's a commercial laundry.
>
> Q. Right. And so yes or no. Were you aware that your building was [being] transformed into something—
>
> A. Into being a commercial laundry, yes.
>
> Q. And that that is a very specialized use of a building?
>
> A. Yes.
>
> Q. Okay. And based upon your belief in Mr. Sipe's ability to perform, you were willing to take that risk?
>
> A. Mr. Sipe had expressed to us that he was going to execute his option to purchase, and with the conversations and visitations we had prior to the execution of the lease, knowing that he had financial backing, we had all assumptions he would be exercising his option to purchase.
>
> Q. And therefore, you took the risk by modifying your building?
>
> A. Yes.

[¶ 16] David Sipe testified:

> Q. As part of the lease, was there discussion about a purchase option?
>
> A. Yes.
>
> Q. Tell me about the aspects of the option.
>
> A. The—every building that I—well, okay. With this building it was very important to me to have a purchase-lease option just because the amount of work that was going into the building, and as far as the equipment that was going to be there, the size, so I wanted to find a long-term home.
>
> * * * *
>
> Q. Did you have every intention of exercising the purchase option?
>
> A. Oh, yes.
>
> Q. And you felt it would fit into your budget as time went on?
>
> A. Mm-hmm.
>
> Q. Yes?
>
> A. Yes.
>
> Q. At the time that you started the remodel on that building, what was the gross income that your company was experiencing?
>
> A. It was close to I want to say 80 or $90,000 a month.
>
> Q. Did you make it known to Profile Properties, their manager, Scot Cook, that you had every intention of exercising the option?
>
> A. Yes.

[¶ 17] After the renovation work began and before it was completed, Clean Start's business failed, and it eventually stopped making its lease payments and fell behind in its payments to Redco. According to Redco,

the last date on which it performed work on the project was February 16, 2009. On March 16, 2009, Profile sent Clean Start a Notice of Default, and on April 10, 2009, it followed with an eviction notice. On April 21, 2009, Redco sent a letter to Profile and Clean Start demanding payment in the amount of $55,523.23 and warning that a lien would be placed on the property if payment was not received within ten days.

[¶ 18] When Redco stopped work on the project, the renovations necessary to convert the property to a commercial laundry operation were not complete. The building's infrastructure was left incomplete and the parking lot that was torn up during the work on the project was not replaced or repaired.

[¶ 19] Clean Start and Redco provided differing accounts as to why Clean Start's business failed and the renovations were left incomplete. The district court summarized those accounts as follows:

The Clean Start business venture ultimately failed. A portion of the work at the P.S. Cook building was completed and some machinery was moved in, but that equipment did not provide sufficient capacity for Clean Start to fulfill its contracts. David Sipe claims that Redco failed to timely complete its work on the second phase of the project, which was necessary to increase capacity. Clean Start attempted to survive until the project could be completed by contracting with out-of-state commercial laundries. It also tried to hire contractors to do some of the work to keep the project moving. The out-sourcing effort was expensive and unsatisfactory to its customers, and it lost its laundry contracts as a result.

Redco claims that it was progressing satisfactorily with the project and would have completed it, although Clean Start was behind on its draws or progress payments. It claims that Clean Start failed because Profile evicted it and took control of the building, and that thereafter Redco had no ability to finish the project. The washers and dryers in the building were removed by the holder of a security interest in them, leaving a structure with interi-

or walls largely removed and other building features demolished.

[¶ 20] Redco and Clean Start agreed that no material issues of fact were in dispute and filed cross motions for summary judgment. The district court interpreted Wyoming's lien statute and ruled that, under the undisputed facts of this case, the statute precluded Redco from filing a lien against Profile's property for work Redco performed under contract with Profile's tenant.

## STANDARD OF REVIEW

[¶ 21] Motions for summary judgment come before the trial court pursuant to Rule 56(c) of the Wyoming Rules of Civil Procedure, which provides that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Formisano v. Gaston,* 2011 WY 8, ¶ 3, 246 P.3d 286, 288 (Wyo.2011). We review a grant of summary judgment as follows:

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. [*Snyder v. Lovercheck,* 992 P.2d 1079, 1083 (Wyo.1999)]; *40 North Corp. v. Morrell,* 964 P.2d 423, 426 (Wyo. 1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of a material fact for trial. *Roberts v. Klinkosh,* 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.,* 887 P.2d

515, 519 (Wyo.1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh*, 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997).

*Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo.2011).

### DISCUSSION

[¶ 22] Wyoming's lien statutes have long addressed whether a lien may attach to real property when it is a tenant who contracts for improvements to a landlord's property. Before 1981, the governing statute read:

> In all cases where a tenant is authorized by the landlord to put any improvements either within or on the outside of any building or upon the land upon which such building shall stand, the person doing any work or furnishing any material for the purpose of such improvement, shall have the same lien upon such house and land as is provided for in § 66–501; provided, it is agreed that the landlord is to pay the costs of such improvement.

*Jordan v. Natrona Lumber Co.*, 52 Wyo. 393, 403, 75 P.2d 378, 381 (1938) (quoting W.R.S. § 66–525 (1931)).

[¶ 23] This lien statute has now been amended to read:

> (a) Notwithstanding the definition of "owner", if a tenant places any improvements either within or on the outside of any building or on the real property on which the building stands, the person doing any work or furnishing any material for the purpose of the improvement shall have a lien upon the landlord's and the tenant's interest in the building and real property as provided by this chapter if:
>> (i) The landlord has agreed to pay the costs of the improvement; or
>> (ii) The improvements are specifically authorized by the landlord.

Wyo. Stat. Ann. § 29–2–105 (LexisNexis 2011).

[¶ 24] The prior version of the statute imposed two conditions before a lien could attach to a landlord's property for improvements made at a tenant's request: first, the landlord must have authorized the tenant to make the improvements; and second, the landlord must have agreed to pay for the improvements. While the prior statute allowed the lien in only the single circumstance where the landlord both authorized the improvement and agreed to pay for the improvement, the revised statute appears to have broken the conditions into two separate circumstances under which a lien may attach. The first circumstance under which a lien may attach is where the landlord has agreed to pay for the improvements. The second circumstance is where the landlord has not agreed to pay for the improvements but has "specifically authorized" the improvements.

[¶ 25] In this case, there is no suggestion that Profile, the landlord, agreed to pay Redco for the improvements it made to the property leased by Clean Start, the tenant, and the record is clear that no contract, implied or explicit, existed between Redco and Profile. Resolution of this case instead turns on whether Profile "specifically authorized" the improvements Redco made to the property pursuant to its contract with Clean Start. Our analysis, then, must begin by determining the meaning of the term "specifically authorized."

### Meaning of Term "Specifically Authorized"

[¶ 26] The question presented to the Court is one of statutory interpretation, and our rules for that task are well established:

> In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed *in pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole,

giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia*. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation.

Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions.

Only if we determine the language of a statute is ambiguous will we proceed to the next step, which involves applying general principles of statutory construction to the language of the statute in order to construe any ambiguous language to accurately reflect the intent of the legislature. If this Court determines that the language of the statute is not ambiguous, there is no room for further construction. We will apply the language of the statute using its ordinary and obvious meaning.

*Cheyenne Newspapers, Inc. v. Building Code Bd. of Appeals of City of Cheyenne*, 2010 WY 2, ¶ 9, 222 P.3d 158, 162 (Wyo.2010) (citing *BP Am. Prod. Co. v. Dep't of Revenue*, 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo.2005)). Whether a statute is ambiguous is a question of law. *Cheyenne Newspapers*, ¶ 10, 222 P.3d at 162. "A statute is unambiguous if reasonable persons are able to agree as to its meaning with consistency and predictability, while a statute is ambiguous if it is vague or uncertain and subject to varying interpretations." *Id.*

[¶ 27] Profile and Redco disagree as to the meaning of the term "specifically authorized," as used in the lien statute, but they both contend that the statute is unambiguous. Profile agrees with the district court's interpretation that the term connotes an agency type relationship requiring that the tenant undertake the property improvements under the landlord's control and to benefit the landlord. Redco contends that the term means only that the landlord has knowledge of and has given its consent or permission for the improvements to proceed.

[¶ 28] The Wyoming lien statutes do not define the term "specifically authorized," and we have reviewed other states' lien statutes and found that no other state uses similar terminology. We therefore look to the plain meaning of the words the legislature chose. "Specific" means "restricted to a particular individual, situation, relation, or effect," *Merriam–Webster's Collegiate Dictionary* 1198 (11th ed. 2007), or "[o]f, relating to, or designating a particular or defined thing." *Black's Law Dictionary* 1528 (9th ed. 2009). "Authorize" means "[t]o give legal authority; to empower" or "[t]o formally approve; to sanction." *Id.* at 153. These terms connote a formality and particularity that exceeds mere knowledge of and acquiescence in or consent to improvements.

[¶ 29] We find this confirmed by looking to the plain meaning of terms the legislature could have used in the statute but did not. In particular, Redco contends "specifically authorized" should mean knowledge and consent, but these terms carry meanings that are distinct and different from the term "authorize." "Consent" means "[a]greement, approval, or permission as to some act or purpose, esp. given voluntarily by a competent person." *Black's Law Dictionary* 346 (9th ed. 2007). "Knowledge" means "[a]n awareness or understanding of a fact or circumstance." *Id.* at 950. In contrast, the term "authorize" suggests a formal relationship—*i.e.*, granting legal authority and empowering action.

[¶ 30] We conclude the legislature must have meant something different from mere knowledge and consent when it used the term "specifically authorized." This conclusion finds support in the Minnesota Supreme Court's interpretation of the term.

[¶ 31] As noted above, no other state has a tenant/landlord provision in its mechanic's lien statutes similar to Wyoming's provision. Minnesota does, however, have a lien statute that uses the term "authorized," when referring to improvements made to property by a person other than an owner. The Minnesota provision reads, in part:

When improvements are made by one person upon the land of another, all persons interested therein otherwise than as

bona fide prior encumbrancers or lienors shall be deemed to have **authorized** such improvements, in so far as to subject their interests to liens therefor. Any person who has not **authorized** the same may protect that person's interest from such liens by serving upon the persons doing work or otherwise contributing to such improvement within five days after knowledge thereof, written notice that the improvement is not being made at that person's instance, or by posting like notice, and keeping the same posted, in a conspicuous place on the premises. As against a lessor no lien is given for repairs made by or at the instance of the lessee.

*Master Asphalt Co. v. Voss Construction Co., Inc. of Minneapolis,* 535 N.W.2d 349, 352 (Minn.1995) (quoting Minn.Stat. § 514.06 (1994)) (emphasis added).

[¶ 32] *Master Asphalt* was a lien foreclosure action brought by a subcontractor against the property of a landlord for improvements made by that landlord's tenant. The tenant in that case was a farmers market, and when the tenant and landlord negotiated the lease, they discussed that the property would require substantial alteration to make it usable as a farmers market. *Master Asphalt,* 535 N.W.2d at 350–51. The evidence in the case was that the tenant showed the landlord preliminary renderings of the planned improvements, but the landlord did not know when the work would begin or who would perform the work. *Id.* at 351.

[¶ 33] The lease contained provisions that required the landlord's prior approval of improvements and twenty day's notice before commencement of any work on the property. *Master Asphalt,* 535 N.W.2d at 350. The tenant violated the lease by commencing work without the required prior notice and approval. *Id.* at 351. Because the landlord did not know that work had begun, the landlord did not have an opportunity to post notice that it would not be responsible for the improvements being made to the property, as provided by the above-quoted statute. *Id.* The statute had been interpreted, however, to provide that if the landlord, regardless of not knowing that work had commenced, had in fact authorized the improvements, the

statutory notice provisions were inapplicable. *Id.* Thus, the issue in *Master Asphalt* was whether the landlord's discussion of the improvements with the tenant and knowledge that improvements would be made to the property constituted the landlord's authorization of those improvements. *Id.*

[¶ 34] The Minnesota Supreme Court held that a landlord's knowledge of and permission to a tenant to make improvements to the landlord's property were insufficient in themselves to constitute "authorization." *Master Asphalt,* 535 N.W.2d at 352. It characterized the equating of "permission" and "authorization" as unsound and held that "authorized" means " 'authorized by contract with, or by direction, or at the instance of the owner or person interested, and *not merely by his permission or consent at the instance of a tenant or vendee.'* " *Id.* (emphasis in original) (quoting *Wallinder v. Weiss,* 119 Minn. 412, 138 N.W. 417, 418 (1912)). The court explained:

> Any other holding would work disastrous results to lessors or vendors who in many instances lease or sell with the understanding, express or implied, that the tenant or vendee, to enjoy the interest acquired, must necessarily make improvements or alterations. *Such mere consent ought not irrevocably to subject the interest of the owner to mechanic's liens for work or material performed or furnished at the instance of a lessee or vendee.*

*Id.* at 352–353 (emphasis in original) (quoting *Wallinder,* 138 N.W. at 418).

[¶ 35] The Minnesota court's holding is in keeping with the majority rule that generally a landlord is not responsible for property improvements made at the behest of a tenant.

> Ordinarily, when repairs, alterations or improvements are made to leased premises at the request of the tenant, the person furnishing labor or materials for this work is only entitled to impose liability for the labor or materials against the leasehold interest and not against the landlord's interest in the premises. However, in certain situations, courts have found some act or omission of the landlord, such as a requirement in the lease that certain con-

struction take place or a failure to post a notice of nonliability after acquiring knowledge of the construction, which suggested the landlord had rendered its interest liable for the work.

Elaine Marie Tomko, Annotation, *Landlord's Liability to Third Party for Repairs Authorized by Tenant*, 46 A.L.R. 5th 1 (1997).

[¶ 36] While the Minnesota court appears to be the only court that has considered the term "authorization" and its meaning within the context of filing a lien for landlord-authorized improvements, other courts have considered more generally what conduct on the part of a landlord will open the door to a mechanic's lien. As the West Virginia Supreme Court of Appeals explained, that conduct usually must be more than acquiescence in the tenant-initiated improvements.

Where the terms of a lease simply authorize a lessee to make improvements to the leased premises, although the improvements become the property of the lessor upon termination of the lease, a party with whom the lessee has contracted to make the improvements may not assert a mechanic's lien against the property interest of the lessor in the leased premises. *See Hayward Lumber & Investment Co. v. Graham*, 104 Ariz. 103, 449 P.2d 31 (1968); *Budget Electric Co. v. Strauss*, 417 So.2d 1143 (Fla.Dist.Ct.App.1982); *Heflin v. W.D.M. Corp.*, 391 So.2d 357 (Fla.Dist.Ct.App.1980); *Indianapolis Raceway Park, Inc. v. Curtiss*, 179 Ind.App. 557, 386 N.E.2d 724 (1979); *Miles Homes of Indiana, Inc. v. Harrah Plumbing and Heating Service Co., Inc.*, Ind.App., 408 N.E.2d 597 (1980); *Landas Fertilizer Co. v. Hargreaves*, 206 N.W.2d 675 (Iowa 1973); *Abbeville Lumber Co. v. Richard*, 350 So.2d 1292 (La.Ct.App.1977); *Messina Brothers Construction Co. v. Williford*, 630 S.W.2d 201 (Mo.Ct.App.1982); *Met Painting Co., Inc. v. Dana*, 90 Misc.2d 289, 394 N.Y.S.2d 392 (1977); *Kazmier v. Thom*, 63 Ohio App.2d 29, 408 N.E.2d 694 (1978); *Commercial Fixtures and Furnishings, Inc. v. Adams*, 564 P.2d 773 (Utah 1977); *McCombs Construction, Inc. v. Barnes*, 32 Wash.App. 70, 645 P.2d 1131 (1982). There must be some other evidence that

the lessee was acting as the agent of the lessor in making improvements to the leased premises, however, mere acquiescence or inactive consent by the lessor of the leased premises to the improvements by the lessee is not sufficient to constitute a finding of agency between the lessor and lessee for the purpose of asserting a mechanic's lien against the property interest of the lessor. *See Miles Homes of Indiana, Inc. v. Harrah Plumbing and Heating Service Co., Inc.*, Ind.App. 408 N.E.2d at 600; *McCombs Construction, Inc. v. Barnes*, 32 Wash.App. at 74–75, 645 P.2d at 1134.

*Dunlap v. Hinkle*, 173 W.Va. 423, 317 S.E.2d 508, 511–12 (1984).

[¶ 37] The legislature is presumed to act in a thoughtful and rational manner with full knowledge of existing law, and statutes are therefore "to be construed in harmony with the existing law, and as part of an overall and uniform system of jurisprudence." *Thunderbasin Land, Livestock & Investment Co. v. County of Laramie*, 5 P.3d 774, 780 (Wyo.2000) (quoting *Wetering v. Eisele*, 682 P.2d 1055, 1061 (Wyo.1984)). This Court is satisfied, given the plain meaning of the term "specifically authorized" and the existing law within which the legislature acted when it used the term, that the legislature meant something more than a landlord's knowledge, acquiescence or permission when it made landlord authorization a basis for a mechanic's lien.

[¶ 38] Having determined what "specifically authorized" does not mean, the Court must determine what the legislature did intend with its use of the term. As discussed above, the plain meaning of authorize is a formal approval, to give legal authority to or to empower. We agree with the district court that this is synonymous with agency. In Wyoming, "[a] relationship of agency is established when two parties agree that one, the agent, shall act on behalf of and subject to the control of the other, the principal." *Maverick Motorsports Group, LLC v. Wyo. Dep't of Revenue*, 2011 WY 76, ¶ 28, 253 P.3d 125, 133 (Wyo.2011). In other words, an agency is created when one party

is empowered or given legal authority to act on the other's behalf.

[¶ 39] This Court holds that the term "specifically authorized," as used in Wyo. Stat. Ann. § 29-2-105(a)(ii), requires a showing of an agency relationship between the landlord and tenant before a mechanic's lien may attach to the landlord's property. Our conclusion is consistent with the plain meaning of the terms used in the lien statute and the legal backdrop against which the legislature passed the law. Additionally, it serves the policy justifications for allowing a lien against a landlord's property for improvements made by a tenant.

[¶ 40] In *Jordan*, this Court explained the conduct a lien was meant to thwart in the situation where a landlord did not agree to pay for improvements but did obligate the tenant to make the improvements:

> If a view should be announced contrary to the doctrine of these authorities, it would, it seems to us, enable an owner deliberately to select a lessee with indifferent financial responsibility, place him in possession of the demised premises under an obligation in the lease to put material and substantial improvements thereon, and, when all were completed, to assert that he, the owner, could rightfully retain the improvements and the lessee only should be held accountable therefor; the consequence being that the owner would be able to secure labor, material, and improvements to his building without a penny's expense to him, while those who supplied them would have parted with their work and property for little or nothing in return. As quite forcibly said by the Supreme Court of Iowa in *Denniston & Partridge Co. v. Brown*, 183 Iowa 398, 167 N.W. 190, 191 [ (1918) ], "It would open the door to great fraud in practice to allow the owner of property to lease it to another, contract with the other to put on permanent improvements, improvements that are only valuable when standing upon the property, and then say that the materialmen and the laborers who place these permanent improvements upon defendant's property have no claim against the property, and must go unrewarded if the tenant is insolvent. It would be an invitation to short leases with agreements in the lease that the tenant should build permanent structures upon the premises during the term of the lease, and this without jeopardizing any interest which the owner had in the property, while greatly profiting from the transaction."

*Jordan*, 52 Wyo. at 407, 75 P.2d at 382-83.

[¶ 41] These policy considerations are at play when a landlord obligates a tenant to make improvements to the landlord's property or empowers the tenant to make those changes subject to the landlord's control and for the landlord's benefit. In other circumstances, where improvements are made at the request of and to benefit the tenant, with no landlord control over the scope or details of the work, we agree with the district court's view in this case:

> Policy considerations support a requirement of more than acquiescence in the work. A contractor may protect himself from exposure by inquiring as to the ownership of a structure, and by then asking for assurances that the owner will pay if the lease is terminated. If the owner indicates that he has not authorized the work and will not pay for it, the contractor may decline the work or seek financial assurances from the lessee.[2]

### Application of the Statute to this Case

[¶ 42] Having held that the term "specifically authorized," as used in Wyo. Stat. Ann. § 29-2-105(a)(ii), requires a showing of an

---

2. This Court notes that a number of states have statutorily provided that a landlord with knowledge that work has commenced on his property must, within a prescribed time after learning of such work, conspicuously post on that property notice of the owner's non-liability for the work. If the landlord has knowledge of the work and fails to post the required notice, the property is subject to a mechanic's lien. *See, e.g.*, Cal. Civ. Code § 8444 (10-day notice); Colo.Rev.Stat. § 38-22-105(2) (5-day notice); Minn.Stat. § 514.06 (5-day notice). The posting of such a notice is not statutorily required in Wyoming, and it would be of questionable legal significance, other than as some evidence that the landlord did not authorize or agree to pay for the improvements being made to the property.

agency relationship between the landlord and tenant before a mechanic's lien may attach to the landlord's property, we must turn then to the question of whether that relationship existed in this case.

[¶ 43] When the relationship of principal and agent is at issue, the party alleging agency has the burden of proving the existence and nature of that relationship. *Hull v. D'Arcy*, 2009 WY 30, ¶ 17, 202 P.3d 417, 422 (Wyo.2009); *Fowler v. Westair Enters., Inc.*, 906 P.2d 1053, 1055 (Wyo.1995). An agency relationship is not dependent on an express agreement of the parties, but may be implied from their words or conduct. *True v. Hi–Plains Elevator Machinery, Inc.*, 577 P.2d 991, 997 (Wyo.1978). This Court has adopted the following test for determining the existence of an agency relationship:

The law creates the relationship of principal and agent if the parties, in the conduct of their affairs, actually place themselves in such position as requires the relationship to be inferred by the courts, and if, from the facts and circumstances of the particular case, it appears that there was at least an implied intention to create it, the relation may be held to exist, notwithstanding a denial by the alleged principal, and whether or not the parties understood it to be an agency.

On the other hand, where it does not appear that there was any express or implied intention to create the relation, it will not be held to exist, as where it appears that the agent was acting on his own behalf.

*Id.* at 998. "[T]he most essential test in determining the existence of an implied agency is the right of the principal to control the conduct of the agent or the actual exercise of such control." *Id.* at 999.

[¶ 44] In *Jordan*, this Court quoted with approval a Missouri decision that described the following circumstances under which a tenant should be deemed the landlord's agent for purposes of allowing a lien for improvements the tenant has made to the landlord's property:

It is true that a tenant, as such, is not the agent of the owner so as to establish a lien against the land of the owner for improvements made by the tenant. *McGuinn v. Federated Mines & Milling Co.*, 160 Mo.App. 28, loc. cit. 32, 141 S.W. 467 [ (1911) ]. Yet, on the other hand, this does not mean that a person, by reason of being the tenant, cannot be given the authority of agent to the extent of being able to bind the landlord's property with a lien under any circumstances. The agency does not spring from the relationship of landlord and tenant, but it may spring from another source, to wit, any act or contract upon the part of the landlord which amounts to the establishment of the power of agent in the tenant.... [I]t has been uniformly held that whenever the landlord binds or obligates the tenant to build or construct permanent and substantial improvements beneficial to the reversionary interest of the landlord, the person furnishing any part of the material or work for said specified improvements under or by virtue of a contract with said tenant has the right to a mechanic's lien against the reversionary interest of the landlord in the land improved-this, on the theory that the tenant, under such circumstances, becomes an agent of the owner within the contemplation of the mechanic's lien statutes. *Gruner & Bros. Lumber Co. v. Nelson et al.*, 71 Mo.App. 110 [ (1897).]

*Jordan*, 52 Wyo. at 405, 75 P.2d at 382.

[¶ 45] These factors are consistent with our general agency principles that focus on the principal's control over the agent's conduct and the benefit to the principal. Similarly, the state of Tennessee has statutorily refined the factors for determining agency under circumstances where a tenant makes improvements to a landlord's property. The Tennessee statute requires consideration of the following:

(1) Whether the lease requires the lessee to construct a specific improvement on the fee owner's property;

(2) Whether the cost of the improvement actually is borne by the fee owner through corresponding offsets in the amount of rent the lessee pays;

(3) Whether the fee owner maintains control over the improvement; and

(4) Whether the improvement becomes the property of the fee owner at the end of the lease.

Tenn.Code. Ann. § 66–11–102(d).

 [¶ 46] The Tennessee statute's tailoring of these factors to the landlord/tenant situation is instructive, but again, the focus of the factors is consistent with our general agency principles. The key questions remain first, the landlord's control over the improvements, and second, the benefit to the landlord.

[¶ 47] The Tennessee Court of Appeals applied these factors to determine whether an agency relationship existed between a landlord and tenant for purposes of allowing a materialman's lien in the case of *Hussmann Refrigeration, Inc. v. South Pittsburg Associates*, 697 S.W.2d 588 (Tenn.Ct.App. 1985). In *Hussmann*, the landlord leased shopping center space to a tenant for a supermarket that was to be the shopping center's anchor business. *Id.* at 590. The landlord worked with the tenant to develop the building plans and constructed the building to the tenant's specifications, leaving the interior unfinished. The lease then authorized the tenant to finish or alter the interior in any manner it elected so long as the building's strength and integrity was maintained. *Id.*

[¶ 48] After the tenant completed its improvements and within two months of its opening, the tenant's business failed. *Id.* at 591. The court applied the four factors set forth above and concluded no agency relationship existed between the landlord and tenant. It explained:

When these criteria are applied to the facts of this case, it becomes evident that Alfred's was not acting as SPA's agent when it contracted with Hussmann. The lease between Alfred's and SPA, as well as their course of conduct, makes it clear that SPA retained no control over the manner in which Alfred's equipped its supermarket. It did not require that any specific improvement be made, and there was no pass-through provision in the lease whereby SPA would pay for the costs of those improvements. Finally, the lease specifically provided that the lessee, at its sole option, may remove any of the improvements it makes at the end of the lease. This supports a conclusion that the improvements Alfred's obtained from Hussmann would not materially benefit the lessor's fee simple interest in the property.

Hussmann in this case asserts that the refrigerant piping installed in the building is of permanent benefit to the lessor. We do not agree. The refrigerant piping installed by Hussmann was uniquely suited to its equipment. Upon the removal of the coolers and other equipment upon the termination of the lease, the copper pipes remaining in the building, if in fact they remained, would be of marginal value because the installation of new or different equipment would necessitate the installation of new piping in different configurations.

*Id.* at 593 (footnote omitted).

 [¶ 49] We resolve the question of agency similarly in this case. First and foremost, while the record is clear that Profile, the landlord, gave permission to Clean Start, the tenant, to make improvements to the property, the record is equally clear that Profile did not require Clean Start to make any improvements, and Profile retained no control over the scope or details of the improvements Clean Start chose to make. Profile did not review, approve, or participate in any manner in the preparation of the plans and specifications for the property renovation, and it had no contact at all with Redco, the contractor that performed the work.

[¶ 50] Additionally, Profile did not agree to pay for the improvements, directly or indirectly. The only work Profile paid for was the electrical work, and it did so only on the condition that Clean Start would repay Profile those amounts through increased lease payments for the first two years of the lease. No contract or other agreement existed between Profile and Redco, and the parties agree Profile never made any assurances to Redco concerning payment or responsibility for the work.

[¶ 51] Finally, the improvements to the property were not made to benefit Profile. The improvements were intended to accom-

modate Clean Start's business, and they were made with the clear intention and expectation that Clean Start would exercise its option to purchase the property. Profile did not permit the alterations with the expectation that the property would be returned to it with improvements. And, even in the event the property were returned to Profile, the lease permitted Clean Start to remove all equipment and machinery so long as the removal would not damage the property and no permanent fixtures were removed.

[¶ 52] The facts of this case do not present the scenario this Court cautioned against in *Jordan,* in which the landlord maneuvers through a tenant to obtain improvements for his gain and then escapes financial responsibility for the improvements. The equities in this case are quite the opposite and illustrate the appropriateness of defining "specifically authorized" to require a finding of agency between the landlord and tenant.

[¶ 53] Although Profile is not being held financially responsible for the obligations incurred by Clean Start for Clean Start's benefit, it is not left without expense. The evidence shows that the building and property Profile regained possession of were in a state of disrepair, and any Clean Start equipment was repossessed by other creditors and removed from the premises. Profile did not enter into the lease with Clean Start seeking to benefit from the alterations to its property, and it did not in fact benefit from Redco's work on the property.

[¶ 54] Additionally, because Profile did not retain control over the improvements, it was not in a position to prevent or otherwise address the payment and timing disputes that arose between Redco and Clean Start. In this regard, the district court decision notes Redco's contention that the reason Clean Start's business failed and construction could not be completed was Profile's eviction of Clean Start. Redco's position finds no support in the record, which shows that the last date on which Redco performed any work on the property was February 16, 2009, and that Profile's eviction notice was not delivered until nearly two months later on April 10, 2009.

## CONCLUSION

[¶ 55] The district court correctly interpreted Wyo. Stat. Ann. § 29–2–105(a)(ii) to require a finding of agency between the landlord and tenant before a mechanic's lien may attach to the landlord's property for work performed at the tenant's behest. In this case, that relationship did not exist. The decision of the district court is affirmed.